(CHANCERY.)

HEPBURN & DUNDAS' HEIRS AND EXECUTORS v. DUN-
LOP & COMPANY.

DUNLOP & COMPANY v. HEPBURN & DUNDAS' HEIRS
AND EXECUTORS.

A court of equity will decree a specific performance of a contract for
the sale of land, if the vendor is able to make a good title at any
time before the decree is pronounced ; but the dismission of a bill
to enforce a specific performance in such a case, is a bar to a new
bill for the same object.

The inability of the vendor to make a good title at the time the
decree is pronounced, though it forms a sufficient ground for refusing
a specific performance, will not authorize a court of equity to re-
scind the agreement in a case where the parties have an adequate
remedy at law for its breach.

The alienage of the vendee is an insufficient ground to entitle the
vendor to a decree for rescinding a contract for the sale of lands,
though it may afford a reason for refusing a specific performance as
against the vendee.

But if the parties have not an adequate remedy at law, the vendor
may be considered as a trustee for whoever may become purchasers
under a sale by order of the court for the benefit of the vendee.

Where the vendor is indebted to the vendee, and the sale is made in
order to pay the debt, the vendor must pay interest from the time
the debt is liquidated until he makes a good title, and the vendee
is accountable for the rents and profits from the time the title is
perfected until the contract is specifically performed.

THESE causes were appeals from the chancery side
of the circuit court of the district of Columbia for
the county of Alexandria. The facts are stated in
the opinion of the court, and the controversy is the

same as in the suits between the same parties reported in 1 *Cranch,* 321., and 5 *Cranch,* 262.

The causes were argued by *Taylor* and *Swann,* for Hepburn & Dundas, and by *Jones* and *Lee,* for Dunlop & Company.

March 9th.

WASHINGTON, J., delivered the opinion of the court.

These causes come before the court upon appeals from the circuit court of the district of Columbia, for the county of Alexandria. The material facts upon which the questions now to be decided arise, are as follows:

Hepburn & Dundas being indebted to John Dunlop & Co., of Great Britain, on account of certain mercantile dealings which had taken place between those parties, the precise amount whereof was disputed, an agreement in writing was entered into on the 27th of September, 1799, between the said Hepburn & Dundas, and Colin Auld, the attorney in fact of John Dunlop & Co.; whereby it was stipulated that the parties mutually agreed to submit all matters in dispute, respecting the demand of Dunlop & Co., to certain arbitrators named in the agreement, whose award should be made on or before the 1st day of January following. That Auld, as the agent of Dunlop & Co., would, on the next day, to wit, the 2d day of January, 1800, accept, from Hepburn & Dundas, the sum which should be awarded to Dunlop & Co., in bills of exchange, or in Virginia currency, at the par of exchange; and upon such payment being made in either way, that Auld would give to Hepburn & Dundas a full receipt and

discharge of all the claims and demands of Dunlop & Co. against them; that, in case Hepburn & Dundas should not, on the said 2d day of January, pay the amount of the said award, either in bills of exchange or money, they should, on that day assign to Auld, as attorney of Dunlop & Co., in the fullest manner, a contract entered into in the year 1796, by Hepburn & Dundas, with a certain William Graham, for the sale of 6,000 acres of land lying on the river Ohio, for the recovery of which, on account of the non-payment of the purchase money by Graham, Hepburn & Dundas had brought an ejectment, which was then depending; that this assignment should be accompanied by a power of attorney irrevocable, to enable the said Auld to pursue all legal means to recover the possession of the land, or to enforce the payment of 18,000 dollars, the amount of the purchase money, whichever of these measures Auld might prefer. Hepburn & Dundas farther stipulated not to interfere with the measures which Auld might choose to pursue for the recovery of the land or the purchase money, and, farther, that whenever any suit brought, or to be brought, for the land, should be judicially determined, or otherwise settled, by an amicable compromise, Hepburn & Dundas would convey the same to the person who, by such determination or compromise, should be acknowledged to be entitled to it in the manner expressed in the contract with Graham. It was also stipulated, that if the purchase money for the said land, with interest thereon to the 2d of January, 1800, should be insufficient to discharge the sum which might be

awarded to Dunlop & Co., Hepburn & Dundas should, on that day, pay to Auld as much money as should make up the deficiency; and if, on the other hand, the said purchase money and interest should fall short of the sum awarded, that Auld would, on the same day, pay to Hepburn & Dundas the excess over and above the sum awarded. Lastly, it was stipulated, that if Auld should recover the land, and be enabled to sell the same for more than was allowed to Hepburn & Dundas, by the said agreement, together with the costs and expenses attending the recovery, Auld should pay to Hepburn & Dundas the expenses incurred in prosecuting the suit commenced by them for the recovery of this land. In pursuance of these articles, an award was made by the day mentioned in the submission, which award stated, that the sum of 4,379*l.* 9*s.* 0¾*d.*, sterling, including interest, would be due to Dunlop & Co. on the 1st day of January, 1800. This sum fell short of the purchase money and interest, due by Graham to the same period, the sum of 494*l.* 6*s.* 8*d.*, Virginia currency. Hepburn & Dundas having prepared a deed of assignment of Graham's contract, and a power of attorney, as stipulated in the above-mentioned agreement, offered to deliver the same to Auld on the 2d of January, 1800, which he refused to accept, because the deed recited, as a part of the consideration, that a release had been executed by Auld, of all the claims and demands whatsoever of Dunlop & Co. against Hepburn & Dundas, and because, as is asserted by Auld, Hepburn & Dundas required Auld to execute such a release prior to the

delivery of the deed of assignment. The suit of Hepburn & Dundas against Graham, for the recovery of the 6,000 acres of land, was prosecuted against his heirs; and in May, 1801, by a compromise between Hepburn & Dundas, and the defendants in the ejectment, judgment was rendered in favour of Hepburn & Dundas.

Without noticing, particularly, the conduct of those parties subsequent to the transactions of the 2d of January, 1800, as well as on that day, it may be sufficient to say, that if the tender made by Hepburn & Dundas was, upon the condition asserted by Auld, to have been annexed to it, and if, in consequence thereof, any legal advantage accrued to him, it was waived by his subsequent conduct. As late as February, 1807, Auld made a tender of the difference between the sum awarded to Dunlop & Co., and the purchase money and interest due upon Graham's contract, and demanded a deed; but this demand was made in a manner, and under circumstances, which this court, upon a former occasion, deemed unreasonable.

Things remained in this situation, until some time about April, 1801, when Hepburn & Dundas instituted a suit at law against Auld, for the difference between the sum awarded to Dunlop & Co. and the amount of the purchase money and interest due by Graham's contract, on the 2d of January, 1800. About the same time a suit at law was commenced by Auld, against Hepburn & Dundas, upon the agreement of the 27th of September, 1799, to recover the whole sum awarded. In the first case,

this court, upon a writ of error, decided upon the pleadings, (which were so drawn as to present the point,) that Hepburn and Dundas had no right to demand of Auld a release of all claims and demands against Dunlop & Co., to be executed as a precedent act to the assignment of Graham's contract, and the delivery of the power of attorney; and, on that ground, judgment was rendered against Hepburn & Dundas.[a]

In the other case, the pleadings presented the question, whether the recital of such a release in the deed of assignment offered to be delivered by Hepburn & Dundas, invalidated the tender? Upon a writ of error, it was decided, by this court, that the recital of the release could not impair the rights of Dunlop & Co., under the agreement of September, 1799, and that it formed no objection to the assignment; consequently, that the tender and refusal amounted to a performance, in like manner as if Auld had accepted the assignment; but that Hepburn & Dundas would still be obliged to execute a proper deed of assignment, and a conveyance of the land, whenever they should be required to do so. Judgment was, accordingly, rendered in this suit against Auld.[b]

Hepburn & Dundas having been thus defeated in their attempt at law, to enforce a performance of the agreement, filed a bill in equity, praying for a specific performance. The answer of Auld contained, amongst other objections to a specific performance, an allegation that the title of Hepburn & Dundas

a 1 *Cranch*, 321.     b 5 *Cranch*, 262.

to the land was defective. Hepburn & Dundas then set forth their title in a supplemental bill. This suit came on to be heard, upon an appeal to this court, at the same time that Auld's suit at law against Hepburn & Dundas, above mentioned, was decided. This court determined, 1st. That since Auld had, by his conduct subsequent to the 2d of January, 1800, waived all objections to the tender of the assignment of Graham's contract on that day, and did not refuse to receive a conveyance which was offered to be made by Hepburn & Dundas, in June, 1801, on account of any defect in the title, but for other reasons which would equally have operated with him had there been no such defect, Hepburn & Dundas would still be entitled to a specific performance if they could then make a good title. 2dly. That the title appeared by the bills to be defective as to 20 acres, being Thomas West's part of Mrs. Bronaugh's 1,000 acres, and also his part of Francina Turner's interest in the same tract, and also on account of the failure to record Thomas West's deed to Hepburn & Dundas for 1,000 acres. For these defects in the title, the bill was dismissed.[c]

Presuming that this decree, which seemed to close for ever the doors of a court of equity against Hepburn & Dundas, opened them to Dunlop & Co. to get rid of the contract altogether. Auld filed the bill which is now under consideration, stating, amongst other things, the previous and present inability of Hepburn & Dundas, to make a good title to this

[c] 5 Cranch, 262.

land; and praying that the agreement may be set aside, and the debt awarded to Dunlop & Co., with the interest thereon, to be decreed; or, that, if the court should consider Dunlop & Co. under an obligation to accept of the land, that only the reasonable value of the land at the time when Hepburn & Dundas's title to it was perfected, should be allowed. The bill, also, contains the general prayer for such relief as is consistent with equity.

Hepburn & Dundas seem to have given a very different construction to the above decree, and supposing that if, within a reasonable time after it was pronounced, they could remove the objections to their title which were pointed out in the decree, they might still call for a specific performance, they soon obtained a conveyance from the heirs of Thomas West, of all their right, title, and interest in and to this land, and on the 27th of March, 1809, less than a month after the decree of dismission by this court, they offered to convey to Auld a good and sufficient title. This offer being refused, Hepburn & Dundas filed a bill against Colin Auld, as attorney of Dunlop & Co., setting forth their ability and readiness to convey an unexceptionable title to this land, and praying that Auld, or Dunlop & Co., might be compelled to accept of a conveyance, and to pay the difference between the agreed value of the land and the sum awarded.

These suits came on to be heard at the same time. In the suit brought by Dunlop & Co., against Hepburn & Dundas, it was decreed by the court below that Hepburn and the heirs of Dundas should pay to Dunlop & Co., or their agent, the sum of 33,060 dollars 37 cents, being the amount of the sum award-

ed, with interest thereon, at five per cent., from the 1st January, 1800, till the time of rendering the decree; but that the sum of 21,112 dollars, part thereof, might be discharged by a conveyance, within a certain time, of the above land to Auld in trust for Dunlop & Co. From this decree an appeal was prayed by both parties.

In the other suit, brought by Hepburn & Dundas against Auld, a decree was made, that upon the complainant's paying to Auld, as attorney of Dunlop & Co., the sum of 11,966 dollars 37 cents, and conveying to the said Auld, in trust for Dunlop & Co., on or before a certain day, the above-mentioned land, the said Auld, as attorney of said Dunlop & Co., should execute and deliver to Hepburn & Dundas such a receipt and discharge of all the claims and demands of Dunlop & Co. against them as the court might approve. From this decree both sides again appealed.

Against so much of these decrees as compel Auld to accept of a conveyance in trust for Dunlop & Co., in part discharge of the debt decreed to be paid by Hepburn & Dundas to Dunlop & Co., the following objections have been made, and are now to be considered.

1st. That Hepburn & Dundas were guilty of a fraudulent misrepresentation of the value of this land; and, also, of a wilful concealment of the defects in the title, whereby Auld was induced to enter into the agreement of September, 1799.

2d. A want of authority in Colin Auld to enter into an agreement for taking a conveyance of land in discharge of the debt due to Dunlop & Co.

3d. The refusal of Hepburn & Dundas to assign Graham's contract, on the 2d of January, 1800, except upon a condition which they had no right to exact, and their interference in the suit with Graham's heirs, and the compromise made with them, whereby (it is contended) they disabled themselves from executing the agreement of September, 1799.

4th. That the title to the land is yet defective.

5th. That the former decree, dismissing Hepburn & Dundas's bill for a specific performance, is a perpetual bar to the relief sought by their present bill.

6th. That Dunlop & Co. being aliens, and incapable of holding lands in Virginia, a court of equity will not compel them to execute their agreement, even if Hepburn & Dundas had been always in a condition to perform it on their part.

1. The first objection appears to be unsupported by the evidence. In respect to the value of the land, the representations made of it in the letters of Hepburn & Dundas to Dunlop & Co., and to Colin Auld, affirm no fact which is proved to be untrue. Those letters contain expressions of the opinion of Hepburn & Dundas, that the land was an ample security for the debt due to Dunlop & Co.; and it must be admitted, that in their letter to Colin Auld of the 6th of September, 1799, they seem to have indulged themselves in very extravagant notions of its value. But it is to be remarked that the grounds of this calculation are fairly stated in the letter, and an opportunity is afforded to Auld to inquire into them and to judge for himself: besides which, it should be recollected that Auld having agreed in his letter

of the 4th of September, two days before the date of this letter, to submit to the award of arbitrators, and to receive an assignment of Graham's contract at the stipulated sum to be paid by Graham, Hepburn & Dundas could have had no motive, at that time, to make an untrue representation of the value of the land. At no antecedent period does it appear that they had made an uncandid statement, upon this subject, to Dunlop & Co., or to Auld. Their opinion of the real value of the property might be incorrect; but a mistaken opinion of the value of the property, if honestly entertained, and stated as opinion merely, unaccompanied by an assertion, or statement, untrue in fact, can never be considered as a fraudulent misrepresentation. That Hepburn & Dundas intended no deception, is evident from the following considerations: 1. That the offer made by them, to Colin Auld, of this land, was that of a security only, for the debt due to Dunlop & Co., which was declined by Auld, upon the ground, that if payment of the debt to Dunlop & Co. was to be postponed until the suit with Graham should be concluded, Dunlop & Co. ought to be entitled to all the benefit of the contract with Graham, and for this reason, a proposition was made by him to accept an assignment of that contract, and to pay the difference between the purchase money and interest thereon, and the sum which might be awarded, in case the latter should fall short of the former. 2. That Hepburn & Dundas had, in the year 1796, sold this land to Graham for the sum at which Auld agreed to take it, and as evidence of their opinion, that the

land had, since that sale, risen in value, they had instituted a suit at law against Graham in order to avoid the sale, and to recover back the land. If any farther answer to this objection be necessary, it may be sufficient to add, that the fraud now charged against Hepburn & Dundas was not thought of, and certainly not imputed to them, when the former suit of Hepburn & Dundas, for a specific performance, was depending.

As to the alleged concealment by Hepburn & Dundas of defects in their title, there is every reason to believe that they were unknown to them until some time in the year 1805, when they endeavoured to remove them, and supposed they had done so. The only objection suggested by the special verdict in the ejectment, was the want of a partition deed between the original grantees of this land, which objection this court has declared to be insufficient to bar Hepburn & Dundas from asking for a specific performance of the agreement.

2. The next objection to the decree below is, that Auld had no authority, in virtue of the power of attorney from Dunlop & Co., to enter into an agreement to receive land in discharge of the debt due by Hepburn & Dundas.

This, like the former, is a new objection, not thought of, or argued, as a reason against a specific performance in the former suit. It is unnecessary to examine, with critical nicety, the import of the expressions used in the power of attorney to Auld. He was empowered to sue for, and to compound and agree, for all debts due to Dunlop & Co., and, in

1816.

Hepburn &
Dundas
.v.
Dunlop &
Co.

general, to do all other lawful acts needful for those purposes, as fully as Dunlop & Co. could do. Under this authority, he entered into the agreement with Hepburn & Dundas, which, there is no reason to doubt, he communicated in due time to his constituents, and it is perfectly fair to consider their acquiescence in that agreement as amounting to a ratification of it. It would be most inequitable to permit Dunlop & Co., at the distance of many years after this agreement was made, to controvert the authority of their agent, and to say they are not bound to perform it, although it must be admitted that, during all that time, it was in their power to enforce it against Hepburn & Dundas, had it been their wish or interest to do so.

3. The third objection to the decrees below, is the refusal of Hepburn & Dundas to assign Graham's contract on the 2d January, 1800, except upon a condition which he had no right to exact, and their interference in the suit with Graham's heirs, and the compromise made with them. In answer to the different parts of this objection, it might be sufficient to remark, that they were urged by Colin Auld in his answer to Hepburn & Dundas's former bill; that they were considered by this court, and decided to be insufficient to deprive Hepburn & Dundas of the relief prayed for. However true the allegation may be, that Hepburn & Dundas refused to assign Graham's contract, and to deliver the power of attorney to Auld on the 2d of January, 1800, unless Auld would first execute a release of all claims and demands of Dunlop & Co. against Hepburn & Dundas, yet the subse-

quent conduct of Auld amounted to a waiver of all objections on that account: his, and his counsel's, letters to Edward Graham, in which he was asserted to be the assignee of the contract with Graham; his instructions to Cook to attend to the ejectment, and to get it brought to a speedy decision; his engaging counsel in that suit; and, in short, his whole conduct throughout the year 1800, all tend to prove, that the transaction of the 2d of January, 1800, had not, in any manner, impaired the rights of the parties under the agreement now alleged to have been violated by Hepburn & Dundas.

As to the compromise said to have been made by Hepburn & Dundas with the claimants under Graham, their conduct, upon that occasion, appears to have been unexceptionable. That a judgment against those claimants, at an early day, was anxiously desired by Auld, and the assistance of Hepburn & Dundas, to effect that object, was expected and required by him, is apparent, from the above letters from him to Edward Graham, and from many other facts proved in the former suit. The endeavours of Auld to hasten the decision of the ejectment, and to obtain a judgment for the land, seem to have been unremitting, until some time in December, 1800, when he declined interfering any farther in the business; but, neither then, nor at any subsequent period, did he express to Hepburn & Dundas a disinclination to obtain a judgment, nor did he forbid them from proceeding to effect it. It is objected, under this head, that Hepburn & Dundas, contrary to an express stipulation in the agreement with Auld, re-

leased to the defendants in the ejectment the right which, as trustee for Auld, they had to demand mesne profits during the time that Hepburn & Dundas had been out of possession of the land; and, farther, that they consented to permit those defendants to retain possession of the premises for a year after the judgment was rendered. Neither of these allegations are supported by the evidence in the cause. The agreement made by Hepburn & Dundas with the heirs of Graham, in relation to the costs of the suit and the mesne profits, disavows, in the most explicit terms, all power in them, and all intention to release either of those claims, but stipulates to indemnify those defendants against these claims, in case they should be made and enforced by Auld, who is declared to be alone entitled to make them. This contract of indemnity, therefore, did not amount to a release, nor did it impair the rights of Dunlop & Co. under their agreement with Hepburn & Dundas. As to the remainder of this objection, it is founded altogether upon the deposition of Mr. Sheffey, the counsel for Graham's heirs, which, as it is explained by the same witness in a subsequent deposition, proves no more, than that such a proposition had been made by Edward Graham to Mr. Hepburn. That it was not accepted by him, is manifest by the judgment itself, which is unconditional, as well as by an agreement made between Hepburn & Dundas and Edward Graham, the day after the judgment was entered.

4. The next objection is, that the title of Hep-

1816.

Hepburn & Dundas
v.
Dunlop & Co.

burn & Dundas to this land, or to some part thereof, is still defective.

In the opinion given by this court, at February term, 1809, in the suit brought by Hepburn & Dundas, for a specific performance, the title was declared to be unexceptionable except, 1st. As to 208 acres, being the part of Sarah Bronaugh's 1,000 acres, to which Thomas West was entitled as one of the heirs of Mrs. Bronaugh, and of Francina Turner, and, 2dly. As to 1,000 acres, the original share of Thomas West, which had been conveyed by him to Hepburn & Dundas by a deed which had not been recorded. These defects have since been cured by a conveyance to Hepburn & Dundas by the heirs of Thomas West, bearing date the 20th of March, 1809, of all their title to the aforesaid parcels of land.

It is, nevertheless, contended, that this conveyance is insufficient to pass a clear and undisputed title; inasmuch as the land may be bound by the claims of creditors, or of purchasers subsequent to the deed from Thomas West to Hepburn & Dundas. The answer given at the bar to these suggestions is entirely satisfactory to the court. If the land be exposed to the claims of subsequent purchasers or mortgagees under West, to be effectual against Hepburn & Dundas, the deeds must have been recorded within eight months after the death of West, at the latest period, either in the general court, or in the district or county court where the land lies. Had any such deeds been so recorded, it was in the power of Auld to have proved the fact by the re-

cords of some one of those courts, and the want of such proof destroys all presumption that any such conveyances were made.

As to judgments against West, they too must be of record; and, after a lapse of 10 years since his death, the court cannot presume the existence of such judgments. As to specialties in which the heirs of West are bound, if there be such, which is not proved, they cannot affect this land in the hands of a *bona fide* purchaser under those heirs.

5. The next objection made to the decrees below, is, that the dismission of the former bill of Hepburn & Dundas, for a specific performance, is a bar to their present bill for the same object. This objection is well founded. If a bill, by the vendor of land, seeking a specific performance of the contract, be dismissed on account of a defect in the title, the doors of a court of equity are, and ought to be, for ever closed against him, notwithstanding he should, afterwards, have it in his power to make a good title; unless, perhaps, in a case where an original bill, in the nature of a bill of review, might be entertained. But the present bill is not founded upon new matter, discovered since the hearing of the former cause, and which it was not in the power of Hepburn & Dundas to produce at that time. It is not pretended that he was ignorant who were the heirs of Thomas West, or that he could not as well have procured a deed from them before, as after the former decree. His ignorance was not of a matter of fact, but of law. He erroneously supposed that his title was good, and on account of the defects existing

in it, at the time of the decree, his bill was dismissed. The rule of the court of equity to decree a specific performance, if the vendor is able to make a good title before the decree is pronounced, is an indulgence which he is not entitled to by the terms of his contract. A majority of this court approves of the rule as a general one, but is not disposed to extend it as such. If, in a case peculiarly circumstanced, an extension of the time for completing the title would be proposed, and should be intended to be granted, the court would either continue the cause, in order to give the vendor time to perfect his title, or would dismiss the bill without prejudice.

The questions, then, which remain to be decided, are, 1st. Whether Dunlop & Co. are entitled to the relief for which they specifically prayed? and if not, then, 2dly. Are they entitled to any other, and what relief, under the general prayer in their bill?

1st. The relief specifically prayed for consists of two parts, 1st. That the agreement of September, 1799, may be rescinded, and the sum awarded, with interest, decreed to be paid. If this should be denied, and Dunlop & Co. be compelled to receive a conveyance of the land, then, 2dly. That the reasonable value only of the land at the time when the title was perfected should be allowed.

As to the 1st. Most of the objections which have been urged against the decree of the court below, for a specific performance, were relied upon by the counsel for Dunlop & Co., as sufficient to set aside the contract. These have already been considered, and the result has been shown to be, that, if the bill

of Hepburn & Dundas, for a specific performance, were unaffected by the dismission of their former bill, none of these objections would be sufficient to preclude them from the relief sought by their present bill. 'If so, they are insufficient to enable Dunlop & Co. to obtain a decree to rescind the contract. There are many cases in which a court of equity, although it would not decree a specific performance, will yet refuse to order a contract to be cancelled. The inability of the vendor to make a good title at the time the decree is to be pronounced, furnishes a very good reason for excluding him from relief in a court of equity; and yet it does not follow that the court will, for this reason merely, set aside the contract. Generally speaking, a court of law is competent to afford an adequate remedy to either party, for a breach of the contract by the other, from whatever cause it may have proceeded; and whenever this is the case, a resort to a court of equity is improper.

But if the contract ought not, in conscience, to bind one of the parties, as if he had acted under a mistake, or was imposed upon by the other party, or the like, a court of equity will interpose and afford a relief, which a court of common law cannot, by setting aside the contract; and having thus obtained jurisdiction of the principal question, that court will proceed to make such other decree as the justice and equity of the case may require. Whether inability in the vendor to make a title, is, of itself, unattended by some peculiar circumstances of hardship, sufficient to justify the court in setting aside

1816.

Hepburn & Dundas

v.

Dunlop & Co.

the contract, need not now be decided. This is certainly not a case where the exercise of this branch of equity jurisdiction can be fairly demanded by Dunlop & Co. Within a month after the recovery of the judgment against the heirs of Graham, Hepburn & Dundas tendered to Colin Auld a conveyance of the land, which was refused, not on account of any defect in the title, but for reasons which would equally have operated with him had there been no such defect. Immediately after the defects in the title were pointed out by this court, they were removed, and the conveyance of an unexceptionable title was tendered and refused. Had Hepburn & Dundas been in a condition to make such a title a month sooner, this court, instead of dismissing their bill, would have decreed a specific performance. Under such circumstances it would be inequitable to set aside the contract. The alienage of the complainants is urged as an additional reason for setting aside this contract. Although the incapacity of the purchaser to hold land might afford a reason for denying a specific performance upon the prayer of Hepburn & Dundas, (a point, however, not intended to be decided,) it is certainly insufficient to entitle the vendor, under the circumstances of this case, to a decree to rescind the contract. But the court does not mean to intimate an opinion that the terms of this contract did expose this land to the danger which is apprehended.

It appears by the contract, and the previous correspondence between these parties, that they contemplated a sale of this land, in the event of the con-

tract with Graham being rescinded, and that the proceeds thereof should be paid over to Auld, in discharge of so much of the debt due by Hepburn & Dundas to Dunlop & Co., as the purchase money due by Graham, with interest thereon to the 1st of January, 1800, would amount to; and this whether the land should sell for more or less than that sum. In this view of the case, the land was considered as a security for a stipulated sum, and Hepburn & Dundas were constituted trustees for whoever might become the purchasers of it. A conveyance to Auld or to Dunlop & Co. does not appear to have been contemplated. But if, in point of law, it should be true that Auld, by neglecting to proceed against Graham's representatives for the recovery of the land, in the name of Hepburn & Dundas, separated the interests of his constituents, this can surely afford no sound reason for setting aside the contract. It is sufficient if Hepburn & Dundas are able and ready to make a conveyance when they shall be required to do so.

2d. The other specific relief prayed for, is, that Hepburn & Dundas may be credited on account of the land for no more than its real value in March, 1809, when a conveyance was tendered and refused. A decree of this sort would be an anomaly in the jurisprudence of a court of equity. It would be an affectation of decreeing a specific performance contrary to the terms of the contract upon which the decree is to operate. It would be, in fact, to make a contract for the parties altogether different from what they had made for themselves, and hen to de-

1816.
Hepburn &
Dundas
v.
Dunlop &
Co.

cree an execution of it. There is no precedent, and certainly no principle of equity to sanction such a decree. Either the contract of the parties must be executed according to the terms of it, or it cannot be executed at all.

The only remaining question, then, is, whether, under the general prayer, the court can grant any, and what relief?

There can be no question but that it is competent to Dunlop & Co., to ask for a specific performance of the agreement, so far as it can now be performed, although the court cannot listen to a similar prayer from Hepburn & Dundas. But this is not the relief specifically stated in this bill; and it is supposed to be unreasonable to compel a specific performance under the general prayer for relief, in opposition to the specific prayer that the contract may be set aside. To this objection, it may well be answered, that if it be improper to rescind, or to modify, the contract, nothing remains to be done, under the general prayer, but to dismiss the bill, or to decree an execution of the contract. But, as the former cannot be presumed to be the object of the general prayer, it would seem to follow that an execution of the contract was intended to be asked for, in case the specific relief should be denied.

For these reasons the court will decree a specific performance, so far as it is practicable, and considering Hepburn & Dundas as trustees for the person or persons to whom this land may be sold, the conveyance will be decreed to be made to such persons

as may become the purchasers of the land under the decree of this court.

The residue of the decree below, which allows to the complainants, Dunlop & Co., interest upon the sum awarded from the 1st of January, 1800, to the time of the decree, is objected to by Hepburn & Dundas, upon the ground that the purchaser of land, to whom neither a conveyance has been made, or possession delivered, is to be considered in equity as the owner, and, of course, entitled to the rents and profits; and that the right of the vendor to the purchase money draws after it a correspondent right to demand interest upon the same until it is paid. This, it must be acknowledged, is the general principle which prevails in the courts of equity.

But it would seem to be inequitable to apply it to a case like the present. Here the purchase money was in the hands of the vendor at the time the contract was made. It consisted of a debt due by the vendor to the purchaser, which the former bound himself, by his agreement, to discharge by bills of exchange or cash, or by an assignment of a contract for land, and a conveyance of a good title to it, and with money to make up any deficiency which might arise by the agreed price of the land falling short of the debt. Neither bills nor cash were paid, nor was the contract assigned, or a conveyance made, for it turned out that the vendor could not make a good title to the whole of the land until March, 1809. They have always retained possession, and the land is, in reality, unproductive of profits in any measure equal to the interest on the

1816.

Hepburn &
Dundas
v.
Dunlop &
Co.

debt. This debt unquestionably bore interest from the moment it was ascertained and agreed to be paid; and not having been paid, nor a tender of a good title to the land made, until March, 1809, it would be highly unjust to stop interest on the debt, until that period.

The written arguments of the counsel, which have been sent to the court, present two questions in relation to interest, which remain to be noticed. It is contended, by the counsel for Dunlop & Co., that interest ought to be calculated upon the sum composed of principal and interest, stated, by the arbitrators, to be due on the 1st of January, 1800, at the rate of 6 per cent. per annum, from that day. On the other side it is insisted that no more than 5 per cent. per annum should be allowed, and this not on the sum found by the arbitrators to be due, but upon the principal sum only.

The court is of opinion, that, although the award does not direct the sum which is found to be due, by Hepburn & Dundas *to be paid* to Dunlop & Co., yet it ascertains the sum which was due on the 1st of January, 1800, and the agreement upon which the submission was made bound Hepburn & Dundas to pay that sum, when it should be so ascertained. The two instruments, taken together, amount to a contract to pay a specific sum, and are clearly within the words, as well as the fair interpretation of the law of Virginia, passed in the year 1796, which fixed the rate of interest at 6 per cent. per annum. This principle being settled, it follows that the interest must be calculated upon the sum

ascertained by the award to be due on the 1st of January, 1810. To separate the principal from the interest, even if the award furnished materials for such an operation, would be, in effect, to set aside the award, and to vary the agreement with which it is intimately connected.

It is therefore the opinion of the court, that Hepburn & Dundas ought to pay interest upon the sum awarded by the arbitrators, after the rate of 6 per cent. per annum, from the 1st of January, 1800, to the 27th of March, 1809, when they were able to make, and did in fact tender, a good and sufficient conveyance to the agent of Dunlop & Co. From the 27th of March, 1809, interest ought to stop; but Hepburn & Dundas ought to account with Dunlop & Co., for the rents and profits of the 6,000 acres of land from that period to the time of rendering this decree.[d]

1816.

Hepburn & Dundas

v.

Dunlop & Co.

[d] In the progress of society the defects of the common law to answer the exigencies of a civilized and commercial age became manifest. It was particularly in not furnishing an adequate remedy for the breach of contracts, where the spirit of the agreement required a specific performance, that these defects were disclosed. For, except in real actions and ejectment, where the proceedings are *in rem*, and the actions of detinue and replevin, where the thing sued for is specifically recovered, a court of common law uniformly gives a compensation in money for civil injuries, whether arising *ex contractu* or *ex delictu*. This remedy is frequently insufficient to repair the injury sustained by the parties, and to place them in the same situation they were in before the breach of the contract. Hence the origin of that jurisdiction, which, although it was long contested by the courts of common law, has at length been firmly established, and matured into a regular system. This system is, however, remarkably subject to the exercise of discretion according to the peculiar circumstances of each particular case. But few inflexible rules can therefore be laid down concerning it.

1816.

Hepburn &
Dundas
v.
Dunlop &
Co.

DECREE.—These causes came on to be heard this 8th day of February, 1816, on the transcript of the

Among those admitting of the fewest exceptions are the following:—1st. This equitable jurisdiction extends to all cases where either the *res* in dispute, or the party, is within the jurisdiction of the court; for it proceeds *in personam* as well as *in rem*, and wherever the land or other thing in controversy is not within its reach, it will compel the specific performance of an agreement by means of its appropriate process acting on the parties. 1 *Ves.* 447. 454.—2d. A specific performance will not be decreed of an agreement whereupon damages could not be recovered at law. But if an action at law cannot be maintained on account of a mere formal defect of the instrument, the agreement will be enforced in equity. 1 *Ves.* 256. 1 *P. Will.* 243. And there are also several other cases of exceptions to this general rule, where, although the agreement was void at law, a specific performance has been decreed, there being a clear ground for the interference of equity, according to the general rules of the court. 2 *Eq. Cas. Abr.* 32. pl. 43. 2 *Vern.* 480. 2 *P. Will.* 243. 2 *Vern.* 24. 3 *P. Will.* 187.—3d. A specific performance will not be decreed where the parties have an adequate remedy at law. 8 *Ves.* jun. 163. 2 *Schoales & Lefroy,* 553.

And the court will exercise its discretion, and leave the contract at law, rather than compel a purchaser to take a doubtful title: 1 *Ves.* jun. 565. 2 *P. Will.* 198. 2 *Ves.* 679. 1 *Bro. C. C.* 74. 4 *Bro. C. C.* 80. 4 *Ves.* jun. 97. 5 *Ves.* jun. 186.—4th. If the vendor can make a good title at the time the conveyance is to be made under the decree of the court, a specific performance will be decreed. 2 *P. Will.* 630. 1 *Atk.* 12. 10 *Ves.* jun. 315. 5 *Cranch,* 262. 8 *Ves.* jun. 655. 7 *Ves.* jun. 202.—5th. In the construction of a contract, it is considered as executed from the time of its being entered into, unless some other time be stipulated for its execution. And so powerful is this rule, that by an equitable fiction, it is held to alter the very nature of things, to make land money, and, on the contrary, to make money land. Upon this principle, land which is sold is considered in equity as the property of the vendee from the making of the contract, and descendible and devisable as such. 2 *Vern.* 536. 1 *P. Will.* 372. 3 *P. Will.* 215. 7 *Ves.* jun. 294.—6th. In decreeing the specific performance of an agreement, *time* may be dispensed with if it be not of the essence of the contract. 1 *Atk.* 12. 2 *P. Will.* 630. 5 *Cranch,* 262. 7 *Ves.* jun. 273. 12

records, and were argued by counsel, whereupon, it is decreed and ordered, that the decree of the circuit court of the district of Columbia for the county of Alexandria, in the suit of William Hepburn and the heirs and executors of John Dundas against Colin Auld, agent and attorney in fact for John Dunlop & Co., be reversed and annulled, and this court, proceeding to give such decree as the said circuit court ought to have given, it is further ordered and decreed that the said bill be dismissed.

And it is further decreed and ordered, that the decree in the suit of John Dunlop & Co. against William Hepburn and the heirs and executors of John Dundas be reversed, each party paying his own costs in this court. And this court, proceeding to give such decree in the said suit as the said circuit court ought to have given, it is decreed and ordered that the defendants, William Hepburn and the executors and executrix of John Dundas, do, on or before the first day of April next, pay to the complainants, John Dunlop & Co. or to their agent or attorney, duly authorized to receive the

1816.<br>~~~<br>Hepburn &<br>Dundas<br>v.<br>Dunlop &<br>Co.

---

*Ves.* jun. 326. 4 *Bro. C. C.* 329. 1 *Ves.* 450. But where there has been gross laches on the part of the plaintiff, a bill for specific performance will be dismissed. 5 *Ves.* jun. 145. 736. 818. 4 *Ves.* jun. 667. 686. 1 *Bro. P. C.* 27. 2 *Eq. Cas. Abr.* 686. pl. 5.—7th. Fraud will vitiate a contract in equity as well as at law, and consequently a fraudulent agreement will not be spe-cifically enforced. And the morality of a court of equity, if the expression may be allowed, is even more strict than that of a court of law in this particular, for *suppressio veri*, as well as *suggestio falsi*, is a ground for refusing to carry an agreement into effect. 3 *Atk.* 383. 2 *Atk.* 271. 1 *Bro. C. C.* 440. *Ambl.* 42ʳ. 10 *Ves.* jun. 192.

same, the sum of nine thousand one hundred and forty three dollars and seventy two cents, being the difference between the sum of nineteen thousand four hundred and sixty-four dollars and twenty-four cents, the value in current money at the par of exchange of the sterling debt stated in the award of William Hartshorne, William Herbert, and William Hodgson, to be due by Hepburn & Dundas to John Dunlop, with interest thereon after the rate of 6 per centum per annum from the first day of January, 1800, to the 27th of March, 1809, and twenty-one thousand one hundred and twelve dollars, the sum due upon William Graham's contract on the first day of January, in the year 1800.

It is farther decreed and ordered, that the 6,000 acres of land in the proceedings mentioned, be sold at public auction to the highest bidder, at such times, in such proportions, and upon such terms as John Dunlop & Co., or their agent or attorney in fact, may direct, and that the proceeds of such sales be paid over to the said John Dunlop & Co., or their agent or attorney as aforesaid; and upon such sale or sales being made, it is decreed and ordered, that the said William Hepburn, or his legal representatives, and, the legal representatives of John Dundas, deceased, do, by good and sufficient deed, or deeds, in law, to be prepared at the expense of John Dunlop & Co., convey the aforesaid land to the purchaser or purchasers thereof, in fee simple, with a general warranty, and free from all incumbrances. And it is farther ordered and decreed, that the sales of the aforesaid land be made under the superintendance

of Colin Auld, the attorney in fact of John Dunlop & Co., or of such other person or persons as the said circuit court may appoint, in case the said Colin Auld should decline to serve, or the said circuit court should see good cause to make such other appointment.

And it is farther ordered and decreed, that the defendants, William Hepburn and the executors and executrix of John Dundas, deceased, do make up, state, and settle, before a commissioner, or commissioners, to be appointed by the said circuit court, an account of the rents and profits of the said 6,000 acres of land since the 27th day of March, 1809, and that they pay over the same to the complainants, John Dunlop & Co., or to their lawful agent or attorney.

And this cause is remanded to the said circuit court for such proceedings to be had therein, for carrying into execution the decree of this court in the premises.[e]

e Mr. J. LIVINGSTON and Mr. J. STORY, did not sit in this cause.