## STEVENSON *v.* MAXWELL.

The allowance of interest as an incident to a debt, is founded on the agreement of the parties: and such agreement may be express or implied.

It is implied, where there is a contract to pay the principal at a specific time, and the debtor makes default; interest being chargeable from that time, upon the ground of the default.

Where such payment is to be made on the conveyance of land at a stipulated period, and the land is not then conveyed, the purchaser is not in default if he omits to pay the price, and no interest is recoverable against him until he is put in default by the tender of a deed.

The general rule in England is, that from the time fixed for the completion of a contract for the sale and conveyance of land, the purchaser is entitled to the profits of the estate, and will be compelled to pay interest upon the price. And the agreement to pay interest, is implied from the purchaser's receiving, or being entitled to receive, the rents and profits.

This rule is modified here, by the difference in the situation and productiveness of real estate, and the higher rate of interest; and in the case of vacant or unproductive property, a contract to pay interest will not be implied, when the purchaser is prevented from obtaining his title through the default or negligence of the vendor. The entry into possession of such property ought not to affect the principle.

And where the purchaser does not go into possession, under or in pursuance of the contract of sale, and the delay in its completion is imputable to the seller, he will not be charged with interest on the purchase money, in the absence of an express agreement to pay interest.

S. & M. being joint owners in possession of several lots, under a lease which contained a covenant for a sale and conveyance to the lessees at their option at a fixed price, tendered the price to the lessor's heirs and representatives, and demanded the title; but the latter, by reason of infancy and other causes, were unable for a long period to convey the same. S. then signed an agreement by

which he covenanted to execute a perfect conveyance to M. of all his right and interest in one of the lots, (which was vacant,) on the 1st of May, 1830, in consideration of a large price to be then paid or secured by M.; and when the legal title was obtained, he would give any further assurance, &c. S. made no effort to complete, or to convey his own interest to M. at or before the day fixed; and early in 1831, he repudiated the agreement, denied its obligation, and disclaimed M. as being the purchaser. M. nevertheless proceeded, and erected a valuable store on the lot, the income from which exceeded the whole cost of both store and lot; and at the same time he made similar erections on the joint account, on the other lots of himself and S. In 1836, S. filed a bill, amongst other things, calling on M. to complete the purchase of the lot, and a conveyance was finally in readiness for M. in 1841.

*Held*, that M. did not enter into possession under his contract with S., and the character of his previous possession was not changed. That S. was not entitled to interest on the stipulated price from May 1, 1830, nor until he made or offered a full conveyance of his right and title in the lot; but he was entitled to the value of the rents in the intervening period as the same would have been derived from the lot, in the condition in which it was when he contracted to sell to M.

Commission, is not limited to a compensation or per centage on the receipt, payment, or transmission of money, or its equivalent. ¾ It is an allowance to a factor, broker, agent, or other person who manages the affairs of others, for his services therein; and is usually ascertained by a per centage on the value of the property sold or amount of the business done.

Under a decree for an account of joint operations in real estate, the master was directed to allow no commissions. *Held*, that this excluded an allowance for superintendence and management of the joint property.

The agreement under which the account was directed, was to make advances for a purchase. The account embraced those, with large disbursements also, and the decree restricted interest on all *advances* to six per cent. *Held*, that the disbursements were not included in the restriction.

November 12, 13, 1844; January 6, 1845.

THE bill in this cause was filed by John B. Stevenson against the heirs, devisees and legal representatives of Thomas Stevenson, together with Hugh Maxwell, whose wife was one of the devisees; embracing a great diversity of matters. It sought an account between the estate of T. Stevenson on the one side, and the complainant and Mr. Maxwell on the other side, in respect of a lease granted by the testator to one Bradshaw, which those two gentlemen had purchased in 1828. This account was taken under the decree, and no question arose upon it on this occasion. It also claimed a specific performance of an agreement made between the complainant and Maxwell, for the sale of one of the Bradshaw lots to the latter; which performance was acceded to

by Maxwell and the decree directed it accordingly. The principal question was under this agreement.

The bill also asked for a settlement of the accounts between the complainant and Maxwell, in respect of their joint operations growing out of the purchase of the lease ; and the decree directed such accounting.

The master having made his report on the accounts between those parties, including the purchase money of the lot sold to Maxwell ; the latter took three exceptions to his report, which now came on to be heard.

The facts elucidating the exceptions will be found in the opinion of the court.

*H. Maxwell* in person, and *Murray Hoffman* for Mr. Maxwell.

*W. Silliman,* for the complainant.

The Assistant Vice-Chancellor.—I will first examine the complainant's right to interest upon the purchase money of his half part of the Cedar-street lot; that being the first point in the order of time, which the case presents.

On the 14th of November, 1828, Mr. Maxwell and the complainant, became the purchasers for their joint and equal benefit, of a lease of that lot and of adjoining lands held by one Bradshaw. The demise was from Thomas Stevenson, and contained a covenant to convey the property in fee at a stipulated price. Mr. Stevenson was dead and his title had been transmitted to sundry persons under his will, several of whom entitled to estates in remainder, were infants. The complainant and the wife of Maxwell took interests under the will; the latter for her life only. In 1829, Mr. Maxwell in behalf of himself and the complainant, offered to pay to T. Stevenson's legal representatives and other parties entitled to receive it, the requisite sum for the purchase of T. Stevenson's title, pursuant to the terms of the lease, and requested a performance of the covenant and a conveyance of the property,

The lease was assigned by Bradshaw to Mr. Maxwell, who

took possession of the premises in November, 1828, for the benefit of the complainant and himself.

On the 29th of January, 1830, the complainant agreed to sell to Maxwell his undivided half of one of the lots into which the Bradshaw premises were subdivided, at the rate of $500 per foot on Cedar-street. The lot was twenty feet and some inches in front by sixty feet in depth, and at the stipulated price, amounted to $7708. It was at that time, a vacant and unimproved lot.

The complainant executed a written agreement for the sale, by which, in consideration of the price above stated, to be paid or secured on the first day of May then next, he covenanted to execute a full and perfect conveyance of all his right and interest in and to the moiety of the lot, and also covenanted that when the legal title to the lot was obtained, he would do any legal act to convey his interest in the lot on payment of the stipulated price.

The complainant executed no conveyance or transfer on the 1st of May, 1830, nor until since the decree in this cause. Mr. Maxwell made no tender of the price. It appears that on that day, the complainant was indebted to him for about half the price, for advances made under the agreement for the purchase from Bradshaw. No active measures were taken to obtain the title from the devisees of T. Stevenson, until this suit was instituted in 1836, and it was accomplished by the decree under which the account in question was stated, which decree was entered March 27th, 1840.

Mr. Maxwell erected expensive and valuable stores and buildings on the lot in 1830 and 1831, and his net income from the lot since their completion, has been $700 per year, over and above all charges and the interest on the cost of the land and the improvements.

On this state of facts, the master has in effect charged Mr. Maxwell with interest from May 6, 1830, at seven per cent. on the contract price with the complainant: which the defendant by his third exception insists is erroneous. And he contends that no interest was chargeable until the title of the lot was conveyed to him.

The princ ple is undoubtedly stated correctly by Mr. Senator

Spencer in his very able judgment in *Rensselaer Glass Factory* v. *Reid*, 5 Cowen, 587, 610, 611, where he says that the allowance of interest as an incident to a debt, is founded on the agreement of the parties; and that such agreement may be express or implied.

1. In this case there is no express agreement to pay interest. The writing is not signed by Maxwell, and contains no agreement on his part; but if he had signed it, it says nothing of interest.

2. An agreement to pay interest is implied, where there is a contract to pay the principal at a specific time, and the debtor makes default in such payment. Interest is then chargeable from the time when the money ought to have been paid, and it rests upon the ground of the default. (*Robinson* v. *Bland*, 2 Burr. 1086, per Lord Mansfield.)

In this case the money was to be paid, or secured to be paid, on the 1st of May, 1830; but there was no default in making the payment, because it was not to be paid at all, unless the complainant executed to the defendant a full and perfect conveyance of all his right and title to the lot sold, and no such conveyance was made or offered to the defendant.

If the defendant had signed the agreement of January 29, 1830, and it had contained an express promise to pay, he would not have been liable to a suit at law for the purchase money, unless the complainant had tendered him at least such a conveyance as that I have mentioned, or shown its preparation and his readiness to deliver it on receiving the price. Therefore no agreement or liability to pay interest can be inferred from Mr. Maxwell's default or omission to pay on the 1st of May, 1830, or at any time since until the conveyance was made to him.

3. The charge of interest is sustained mainly on the ground that Maxwell had the possession of the lot, and has received profits from it to more than the amount of the interest on the purchase money.

I do not think that the fact of his realizing more than the interest, is to have much weight, because that result is owing to the large expenditures made by him in improving the lot. As it stood when the complainant sold his interest in it, the rents and

profits were trifling in amount, and probably if let from year to year from thence till the decree, it would not have produced the half of one per cent. on the purchase money. The agreement to pay interest, if it is to be implied from the possession, must in this case, rest upon that consideration, irrespective of the value of the possession as compared with the amount of interest.

The well settled rule in England is, that from the time fixed for the completion of the contract, the purchaser is entitled to the profits of the estate, and will be compelled to pay interest for the price. This is the general rule, and Mr. Sugden says this holds good whether the purchaser does or does not take possession of the estate. (3 Sugd. on Vend. 97, Chapt. 16, sect. 1, § 1.)

The allowance of interest to the vendor, is however usually deemed consequent upon the purchaser's receiving, or being entitled to receive, the rents and profits of the estate, where there is no express agreement to pay interest.(a)

In England where real estate is almost universally productive, and the rate of interest adopted by the courts of equity in cases of specific performance is only four per cent.; the operation of this general rule is equable and just.

In this country, a much larger proportion of the real estate sold, is entirely unproductive, and the rate of interest in the courts is that of the statute ; in this state, seven per cent.

In the case of a vacant city lot, or of wild land, not bought for immediate improvement or cultivation, and where there is no express contract for interest; it would be repugnant to the moral sense to compel the purchaser to pay interest on the price, when through the default or negligence of the vendor, he had not received a conveyance, and thus had been for years prevented from disposing of the property. Nor would the fact that the buyer had taken all the possession that he could of such property, and had not kept the money by him all the time in order to pay it on receiving the title, affect the natural equity of the case. Yet by the modern English rule, he would be charged with interest under such circumstances.

---

(a) See *Adams* v. *Heathcote*, before Vice-Chancellor Sir L. Shadwell, March 26, 1846 ; 10 Lond. Jur. Rep. 301.

There are several exceptions to the general rule in England, and it has been still more departed from in our courts. Thus in the complicated case of *Hepburn* v. *Dunlop*, 1 Wheat. 179, 206, the vendor was indebted to the vendee, and the sale was made to pay the debt. This was in 1799, but a good title was not made to the vendee till 1809. The court held that the vendor must pay interest on the debt till that time ; in other words, the purchaser paid no interest until he got a good title.

In *Birdsall* v. *Waldron*, 2 Edw. Ch. R. 315, the Vice-Chancellor decided that the seller, although in possession, would not be bound to pay his money into court before obtaining a title, where he went into possession with the understanding that he was not to pay it until he had a title. And the ground of the decision goes to the payment of interest also.

One of the exceptions made by Mr. Sugden is where the interest is more than the profits, and the delay was clearly made by the vendor, in which case the court gives the vendor no interest but leaves him in possession of the interim rents and profits. (3 Sugd. on Vend. 116, ch. 16, sect. 1, § 43.)

It is manifest, that if in such case the purchaser had gone into possession expecting a prompt completion of the sale, the equitable rule ought to be the same, where the delay is the fault of the seller.

I will refer to some other authorities hereafter, in reference to particular views of this case.

One ground of resisting interest here is, that Mr. Maxwell did not enter into possession under the contract of purchase. He was already in possession as the assignee of Bradshaw's lease, and at law, he was in the sole and exclusive possession.

There was no change in the character of his possession, consequent upon his purchase, until he received the title under the decree. If his right to the possession had been challenged in the intervening period, he would have sustained his right, not as a purchaser from the complainant, but as the assignee of Bradshaw's lease.

If it be said that in equity his possession was that of the complainant as well as himself, under the agreement of November, 1828, and that the character of the possession was changed by

his assumption of exclusive ownership, and erecting buildings after the sale to him; I answer, that the proofs are consistent with the idea of the same joint equitable possession after the sale. Mr. Maxwell made similar improvements and erections on the other property embraced in the agreement of November, 1828. The only difference is, that he has kept a separate account of the latter, and brought that alone into the account against the complainant.

I do not perceive any reason in this case for straining a point against the defendant in order to charge him with interest; and I must hold that he did not go into possession under the contract in question.

The authorities are strong for exempting the purchaser from the payment of interest in such circumstances, where the delay is not imputable to him.

In *Blount* v. *Blount*, 3 Atk. 636, Lord Hardwicke declared, that as no possession was delivered to the purchaser by virtue of his purchase, and it was not his default at all that the conveyances had not been made, there was no pretence for making him pay interest. In that case the purchaser was in possession before making the purchase. Lord Hardwicke also says that it cannot be laid down in certain that from the time of possession, a purchaser shall always pay interest.

In *Paton* v. *Rogers*, 6 Madd. 256, the Vice-Chancellor said that a decree for interest from the time when the money was to be paid, was generally made; but not where the vendor has improperly delayed the execution of the contract.

In *Esdaile* v. *Stephenson*, 1 S. & S. 122, Sir John Leach, V. C. held that where there was no express stipulation to pay interest, and the delay in completing the contract was occasioned by the vendor; if the interest is much more in amount than the rents and profits, the court gives the vendor no interest, but leaves him in possession of the interim rents and profits.

He adhered to the same principle in *Monck* v. *Huskisson*, 4 Russell, 122, note *a.*, and it was adopted by Lord Lyndhurst in *Jones* v. *Mudd*, 4 Russell, 118.(*a*)

---

(*a*) See *Winterbottom* v. *Ingham*, in the Queen's Bench, Trinity Term, 1845,

The case of *Birdsall* v. *Waldron,* before cited, is also an authority against the claim for interest on the ground of possession. The Vice-Chancellor there said, that if there had been delay in the performance without the default of the purchaser, he would not, although in possession, be obliged to pay the purchase money.

In *January* v. *Martin,* 1 Bibb's R. 586, the vendee went into possession under the contract. He tendered the purchase money, which was refused. He made large improvements on the premises. The vendor was not allowed interest.

In *Hart* v. *Brand,* 1 A. K. Marsh. Rep. 159, in the same court, it was held that one holding himself in readiness to pay, and the other refusing to perform, the latter is subjected to the loss of interest.

In the case before me, there was no change of possession consequent upon the contract to sell. Maxwell was not bound to pay the purchase money, until he received, at least, a conveyance of the complainant's right and interest in the lot. Therefore there was no default on his part, until such conveyance was made or tendered to him. He did not agree to pay interest at all. The law will not imply such an agreement, except from his default, or from the taking of possession being deemed an equivalent. And neither of those circumstances exist here.

It was urged that Maxwell knew perfectly well, and much better than the complainant did, that the title could not be completed by the 1st of May, 1830.

I cannot know from the case, how that fact is, nor whether one party or the other was aware of it. The contract of sale apparently contemplated two conveyances; one of the complainant's interest as it then stood, and the other of the legal title when obtained. There was nothing to prevent the complainant from transferring the former, on the 1st of May, 1830; and having omitted to execute such transfer, he was clearly in default on his part. He had no right to call upon the purchaser for the price,

10 London Jurist Rep. 4; against allowing interest, where a purchaser in possession was prevented from completing for the want of a good title. And see 10 London Jurist, Miscellany, 81.

until that was done.  Whether on that being done, he could have required any thing more than security for the payment of the principal, whenever the legal title should be procured, I need not determine.

Instead of performing so much of his contract, as was plainly within his power, on the 1st of May, 1830, he does not appear to have taken any measures towards performance during that year.  On the contrary, on the 31st March, 1831, he repudiated the contract, denied its obligation, and disclaimed Mr. Maxwell as being the purchaser.

How long he maintained this position, does not distinctly appear.  It was abandoned at all events, when this bill was filed, for he therein sets up the agreement for the sale, as binding upon Maxwell as well as himself.

It would be extraordinary upon such a state of facts, to allow to the vendor interest from the time when he ought to have completed his contract; he not only neglecting to perform, but denying his obligation to perform.

In *Hart* v. *Brand*, before cited, the court said that no proposition can be more clear than if the purchaser were really and *bona fide* prepared to make payment, and unequivocally intended it, and the vendor has evinced a determination not to perform the contract if possible, the latter is not entitled to interest.

I was referred to many authorities to the point that interest is payable from the time stipulated for the performance of the contract; and in some of them, this has been decreed in respect of possession *taken and continued under the contract,* where there has been great delay on the part of the vendor in completing the sale.

The latter, as I have endeavored to show, are not applicable; and as to all the cases, they depend very much upon their respective circumstances.

Thus, in *Fludyer* v. *Cocker*, 12 Ves. 25, the act of taking possession, was deemed an implied agreement to pay interest.

In *McKay* v. *Melvin*, 1 Iredell's Eq. R. 73, the purchaser went into possession, and the delay was occasioned by the death of the vendor.

In *Mayo* v. *Purcell*, 3 Munf. R. 243, there was an express

contract to pay interest after three months, and after going into possession of nearly all the premises, the purchaser resisted performance, because he did not get possession of the whole. The court decreed against him because he knew when he bought, that a part of the land was occupied adversely, and was aware of all the defects in the title.

In *Hundley* v. *Lyons*, 5 Munf. R. 342, there was a delay in making the deed on account of a misunderstanding between the parties, in relation to the terms of the sale. Chancellor Taylor directed interest from the actual execution of the deed, and profits to go to the purchaser from that time. The Court of Appeals for the cause above mentioned, decreed the profits to the purchaser from the time of the sale, and interest to be paid by him *from the end of a year* after the times when the respective instalments ought to have been paid by the purchaser. The purchase money was payable in instalments without interest.

In *Selden* v. *James*, 6 Rand. R. 465, the vendee went into possession, and assented to the recording of the deed made to him, and claimed under it. He delayed the payment of the principal, because of an adverse claim set up to the land, which turned out to be unfounded. He was decreed to pay interest.

In *Brockenbrough* v. *Blythe*, 3 Leigh, 619, there were two grounds upon which the charge of interest to the purchaser was sustained. The purchase money was ultimately payable to one of the defendants, who was not a party to the contract of sale, and only assented to convey, on receiving the money with interest.

Another ground was, that the purchasers went into possession and kept possession under the contract, and that it was at the option of Blythe, the covenantor, to receive the price and give them a conveyance with security for ultimately procuring the title, or to let them keep the price in their own hands, the title remaining as it was. One of the judges says, that where the vendee comes for specific performance, and he has had possession of both the land and the purchase money, he shall pay interest, even though the vendor has been in default unless the money has been idle and the vendor had notice of it. President Tucker says, p. 647, that the general rule is, that the purchaser who is let into possession must pay the interest for the purchase

money, and the party claiming an exemption from it, must bring himself within some established exception.

Referring these decisions to the peculiar facts in each case, they do not conflict with my conclusion upon the question presented here.

The most that I feel warranted in doing for the complainant, is to allow him the value of the rents and profits which would have been derived from the lot, had it continued till 1840, in the same state in which it was when he sold his interest in it to Maxwell, and been rented from year to year.

The third exception to the master's report will therefore be allowed, and the account stated on the principle just mentioned.

2. The first exception is taken because the master refused to allow to Mr. Maxwell any thing for his superintendence and management of the joint property of himself and the complainant.

The decree under which the master proceeded, directs him to allow *no commissions* to Maxwell. The subject of compensation for services appears to have been discussed between these parties in 1833, when Mr. Ferris attempted to adjust their differences. The term, *commission*, is not limited to a compensation or per centage on the receipt, payment or transmission of money or its equivalent. It embraces the allowance for a great variety of services not connected with those duties. Thus a broker, who negotiates contracts relative to property, with the custody of which he has no concern, and for which he neither receives or makes the payment, obtains his commission on the transaction. In his case, as well as in most instances, the commission is usually ascertained by a per centage on the value of the property sold or amount of the business done. So of the *del credere* commission of a factor, a portion of it is for the guarantee of the solvency of the purchasers of the goods intrusted to him.

In 1 Bouvier's Law Dict. 281, commission is defined to be an allowance or compensation to an agent, factor, &c., or other person, who manages the affairs of others, for his services in performing the same. And see 1 McCulloch's Commercial Dict. 673, title, Factorage. 3 Chitty's Comm. Law, 221.

Stevenson v. Maxwell.

In Smith's Mercantile Law, 54, it is said that the remuneration to which an agent is entitled, is often called *commission.*

So Mr. Justice Story says, the compensation which belongs to the agent in consideration of the duties and responsibilities which he assumes, and the labor and services which he performs, is commonly called a commission. (Story on Agency, § 326.)

Such being the meaning of the term used, and the subject of these services having been agitated between the parties; I think the decree must be deemed to preclude the claim for compensation.

The first exception to the master's report must be overruled.

3. The remaining exception relates to the charge of seven per cent. interest against Mr. Maxwell, while he is allowed interest at the rate of six per cent. only.

The decree directs an account to be taken between these parties touching their respective receipts and *disbursements,* growing out of their operations under the agreement of November 14, 1828, and in taking the account, the master is to allow Maxwell interest at the rate of six per cent. on his *advances,* and he is to make all proper charges and allowances as between the parties.

In view of the language used, in the first instance *disbursements,* and in the next place, *advances,* it is probable that the direction of six per cent. was intended to apply to the advances, properly so called, which Maxwell stipulated to make in that agreement.

But there is another ground which is, in my mind, decisive of the point. I find no specific direction to the master to charge or allow any interest to either party, except to Maxwell on those advances. And under his general authority by the rule of the court, to charge and allow interest as shall be just and equitable, there is no apparent reason why if he thought it discreet to charge interest, he should charge to one party a higher rate of interest than the decree directed him to charge to the other.

The agreement between the parties would give to Maxwell seven per cent. on his advances. The decree restricts him to six per cent. without any expressed cause. It seems from the provision itself, that it was expected the interest account would all be on one side. On its turning out that interest should be

charged against Maxwell in the latter stages of the account, it is surely inequitable that he should pay seven per cent. when in the earlier stages he is allowed six per cent. only.

The second exception to the report is therefore allowed.

As the account is to be stated anew, I will make no direction as to the costs in the cause. Neither party will recover costs on these exceptions or the hearing thereon.(a)

---

(a) On settling the decree, there was some diversity between the counsel as to its form.

THE ASSISTANT VICE-CHANCELLOR.—Upon the third exception, the interest must commence against Maxwell at the end of thirty days from the filing of the master's report, dated March 15, 1841. By the decree of March 27, 1840, the parties were to execute a conveyance to Maxwell after the master had reported on the accounts between the now litigants on the one side, and the estate of Stevenson on the other; upon the payment by Maxwell of one-half of the amount reported to be due.

The master's report of March 15, 1841, shows the result of that accounting, and that such payment had been made.

Thirty days were sufficient to confirm that report, and settle and execute the conveyance; and if not voluntarily executed the court would have speedily enforced it.

The title was equitably in Maxwell from the confirmation of the report; and from the time he might have had the legal title, I think he must pay interest.

In regard to the charge to Maxwell for the use of the lot, it will terminate when the interest commences on the purchase money.

The rent paid to the Stevenson estate, ought not to enter into this account for use and occupation. Those rents, as well as the price fixed in the lease for the purchase of the fee, were a part of the cost of the whole lot to the complainant and Maxwell, which they were equally liable to pay. The taxes and assessments on the half of the lot, should be credited to Maxwell to the extent that the half lot would have been subjected in its unimproved state.

As to the rate of interest, it is restricted by the original decree to six per cent. on Maxwell's advances. It becoming necessary to direct in this decree, the specific rate to be charged and allowed on the other items of the account, I have concluded that it should be the legal rate of interest. And that the term " advances," in the original decree, should be deemed to mean the advance which Maxwell was bound to make by the agreement of November 14, 1828, and should not include sums, which by that agreement, the parties were to pay equally in the first instance, but which were in fact wholly paid by Maxwell.