## JONATHAN BURTCH vs. HANNAH HOGGE and others.

Where the agent or attorney of the complainant examined witnesses and wrote their deposi- First Circuit.
tions, and the commissioner before whom they were taken, was absent from the room seve-
ral times during the examination, and the defendant did not appear and cross examine the    Burtch
witnesses, the proceedings were held to be irregular, and the depositions were suppressed.    vs.
                                                                                            Hogge.

It seems that courts of equity will take notice of irregularities and unfairness in taking deposi-
tions, at any stage of the proceedings in the cause, before hearing.

Where under a parole agreement to convey land, the purchase money had been paid, posses-
sion taken, and valuable improvements made, it was held to be sufficient to take the case
out of the statute of frauds.

Inadequacy of price, where it is so gross and palpable as of itself to appear evidence of actual
fraud, may be sufficient to induce this court to stay the exercise of its discretionary power
to enforce a specific performance, and leave a party to his remedy at law; but inadequacy of
price *merely*, without being such as to prove fraud conclusively, is not a good objection
against decreeing a specific performance.

THE bill in this case was for a specific performance of a contract for the sale of real estate.

The bill charged that Robert Hogge, the husband of said Hannah, (who was now dead,) in the month of May, 1832, was seized and possessed of an undivided interest of seven and a half acres of land at the mouth of Black river, in the county of St. Clair, being part of the north east fractional quarter of section ten, in township six north, of range seventeen east, containing, in the whole, ninety-one acres. That May 25, 1832, Robert Hogge agreed to sell to Jonathan Burtch, the complainant, seven acres of said land owned by him, for the consideration of $150. That in June and July following, in various sums, and at different times, Burtch paid to said Robert, $129 of said consideration, for which said Hogge gave his receipts and put complainant in possession of the premises. That complainant had made improvements on the premises to the amount of $1,500 and upwards, and had kept possession of said premises ever since. That some time in the month of May, aforesaid, complainant procured a deed to be made out from Hogge to him, of the land; but before it was executed, in August thereafter, Hogge was suddenly taken ill, and died intestate, leaving the defendant, his widow, and heirs at law,

First Circuit.

Burtch
*vs.*
Hogge.

to inherit the estate. That his wife administered on his estate, and the balance of the purchase money was paid to her, and she acknowledged satisfaction and gave receipts therefor, and said she felt desirous and willing to convey the legal title to the lot, if authorized so to do.

The bill prayed that the defendant be compelled, specifically, to carry said agreement into effect by executing a conveyance of the premises to the complainant.

The answer of *Hannah Hogge*, (widow of Robert Hogge,) admits that *Robert Hogge* was seized of seven and a-half acres of land as alledged in the bill. Neither admits nor denies there was a contract made as alledged in the bill, but denies any positive knowledge of its terms; admits that she knew of the payment of money by complainant to Hogge, and that she received money after the death of Hogge, on account of the land, and gave receipts therefor. Denied that she ever agreed to convey her right of dower, and also denied that there was any contract in writing, and claimed the benefit of the statute of frauds.

*John Doran*, in his answer, denied any personal knowledge of the matters stated and charged in the bill, and alledged that he had been appointed admistrator, *de bonis non*, of. the estate of Robert Hogge, and claimed the benefit of the statute of frauds. *The heirs*, who were minors, answered merely *pro forma*, and denied any personal knowledge of the matters stated and alledged in the bill.

*The complainant* replied generally to these several answers.

An order was obtained to take testimony, requiring ten days previous notice to be given by the party taking testimony; the notice was served by complainant on Woodbridge, solicitor for defendants, at Detroit, on the seventh day of September, 1835, to take testimony at Palmer, St. Clair county, on the 16th, 17th and 18th days of the same month.

The testimony having been taken, returned and filed,

WOODBRIDGE & BACKUS, on behalf of the minor heirs, move to suppress the depositions taken on the 16th and 17th days of September, for irregularity.

It appeared from the certificate of *Horatio James*, the special commissioner appointed to take the testimony, that several witnesses appeared before him, at his office in St. Clair, on the part of the complainant, and that *Ira Porter, Esq.*, appeared as counsel for the complainant, and put questions generally to the witnesses, and took down, in his own handwriting, all the answers given to such questions by the witnesses, and reduced to writing all the depositions taken; that neither the defendants, their agent, or attorney, were present at the examination until all the witnesses had testified; that he had frequent occasions to leave the room, and was not present all the time during the examination; that he only administered the oaths to the witnesses after their depositions were fully written by Mr. Porter.

The affidavit of *John Thorn* stated that he was present at the taking of the depositions in question, and that *Ira Porter* put all the questions to the witnesses and wrote all the depositions; that Porter appeared to act as the attorney for Burtch, the complainant, in taking the testimony.

*Ira Porter* states in his affidavit, that some time in the summer of 1835, Burtch, the complainant, informed him that depositions were to be taken at Palmer before Horatio James, a special commissioner appointed for that purpose, to be used upon the trial of a cause pending in chancery, wherein he was complainant and Hannah Hogge and others were defendants; that Burtch wished him to testify in the matter, and that he, Porter, agreed to attend as a witness; that Burtch requested him to see something to the enclosing and transmitting of the testimony to Detroit, but did not employ him as counsel or attorney; that he was not at that time an attorney in this state or elsewhere; that, at the solicitation of James, the commissioner, he wrote his own deposition and those of several other witnesses then in attendance; that John Doran, who appeared to be interested in the matter, either as one of the parties or as their agent, was present, and did not object to his writing the depositions; that the depositions were written by him truly and faithfully, and were read to, and approved of by the

First Circuit. witnesses, and that he had no interest in the event of the
cause.

Burtch
vs.
Hogge.

H. T. Backus, in support of the motion, cited—*Hinds Ch.*,
304, 334, 301, 324; 2 *Mad. Ch.*, 412; *Newl. Ch.*, 131; 2 *How-
ard's Eq.*, 591; 2 *Chan. Rep.*, 393; 15 *Vessau*, 380; 1 *Har.
Ch.* 360.

A. D. Frazer, contra.   Cited—3 *Brown, P. C.*, 620; 1 *Pe-
ter's Rep.*, 307; 5 *John. Ch. Rep.*, 191; 2 *Id.* 249.

The Chancellor.   There can be no doubt that the conduct
of the commissioner in taking these depositions, was highly
improper.

Thorn in his affidavit states that Porter appeared as attorney,
asked all the questions and wrote the depositions, and it is ap-
parent that he appeared there on different days, and when he
was not called there as a witness.

Porter himself says in his affidavit, he was requested by
Burtch to see to the inclosing and transmitting the testimony
to Detroit; he says he was not employed as counsel or attor-
ney, and adds that he was not admitted as an attorney in this
state or elsewhere at the time; but he does not deny that he
was acting as the agent of Burtch, and he states that he wrote
his own deposition and several others.

The certificate of James, the commissioner, although, per-
haps, irregular, yet if looked into, would not lead the court to
place much confidence in the faithful execution of his duty as
a commissioner.   He says in his certificate, that he was ab-
sent from the room a part of the time during the examination
of the witnesses and the writing of the depositions.   The pro-
ceedings in taking these depositions were clearly irregular.
(*See* 2 *Chan. Rep.*, 399; *Hinds, Ch.*, 344, 348; 15 *Ves.*, 380.)

But it is urged that the irregularities in taking the deposi-
tions are waived by the defendants having taken further steps
in the cause, and the case of *Skinner* vs. *Daton et. al.*, 5 *Johns.
Ch. Rep.*, 191, is relied on as authority to support this position.
That was a case where the notice to take testimony was

claimed to be insufficient; no want of fairness in the execution of the commission was complained of, and three terms had been suffered to elapse after notice to take testimony had been given. An offer to cure the defect of notice had been made and declined, and the cross examination of the witness had been expressly waived. This was a very different case from the one now under consideration.

The case cited in 3 *Brown's Rep.*, 620, was a case on appeal, and the depositions had been used at the hearing in the court below. In the case of 1 *Peter's Rep.*, 307, the deposition had been read without objection at the hearing; but the judge in that case, says: "if the objection had been made to the admission of the deposition at the hearing, it ought not to have prevailed, because the opposite party appeared and cross-examined the witness. In this case it was a question of regularity merely, and there was no pretence of impropriety or unfairness in taking the deposition.

Courts have always looked with jealousy upon proceedings of this kind, and guarded, with great care, the rights of the parties against imposition and fraud; and under our practice, where depositions are generally taken without interrogatories being filed, it seems almost indispensable to the ends of justice, that this court should scrutenize well the proceedings in taking depositions before it permits them to be read as evidence. I should feel great reluctance in deciding this case upon testimony taken as losely as this seems to have been.

In 3 *Atk. Rep.*, 812, although the affidavits had been read, the court, for the reason that the depositions had been unfairly taken and for other reasons there appearing, dismissed the proceeding with costs, to come out of the pocket of the solicitor who had unfairly taken the depositions.

It seems that courts of equity do take notice of errors of the kind, here complained of, at any stage of the proceedings in the cause before hearing.

The depositions taken in this case must be suppressed.

But as in the case of *Shaw* vs. *Linsday*, 15 *Ves.*, 384, if it should happen that the witnesses could not be examined again,

First Circuit. this order does not go to the length of preventing the court's
Burtch    directing, hereafter, that the depositions may be opened if
vs.
Hogge.    necessity should require the rule to be dispensed with.

Depositions suppressed.

A new order was obtained to take testimony, and the testimony having been taken and returned, the cause came on for final hearing.

A. D. FRAZER, for complainant.

Inadequacy of price, unless it amounts to conclusive evidence of fraud, is not, of itself, a sufficient ground for refusing a specific performance. Although this was a case of an auction sale, the opinion was pronounced on the general doctrine. (*Hatch* vs. *Hatch*, 9 *Vesey*, 292.)

In another case the chancellor declined giving an opinion on this doctrine. (*Mortlock* vs. *Butler*, 10 *Vesey*, 292; *Western* vs. *Russell*, 3 *Ves. & Beam's*, 187.)

In another case it was expressly "held on a bill for specific performance, that if the parties bargained with their eyes open, and without imposition or surprise, mere inadequacy of price was not of itself sufficient to prevent the court from administering its usual equity." (*Colyer* vs. *Brown*, 1 *Cox*, 428.)

This say the court of errors in the state of New York in a similar case: "is the doctrine of common sense and common honesty, for it may be asked with propriety, what right have we to sport with the contracts of parties fairly and deliberately entered into, to prevent them from being carried into effect?" The court further say, "much property is held by contract, purchases are constantly made on speculation, the value of real estate is constantly fluctuating, and in such matters there most generally exists an honest difference of opinion in regard to any bargain, as to its being a beneficial one or not. To say, when all is fair, and the parties deal on equal terms, that a court of equity will not interfere, does not appear to me to be supported by authority." (*Seymour* vs. *Delancy*, 3 *Cowen*, 532; *King and others* vs. *Hamilton and others*, 4 *Peters R.*, 328; *Day* vs. *Newman*, 2 *Cox*, 77; *Willan* vs. *Willan*, 16 *Ves.*, 83.)

WOODBRIDGE and BACKUS, for defendants.

H. T. BACKUS.

The specific execution of agreements in a court of chancery, is not *ex debeto justitice.* (*Attorney General* vs. *Day,* 1 *Ves.*, 219.) But a bill for the specific performance of an agreement, (even where the agreement is in writing,) is addressed to the sound discretion of the court, in the exercise of its jurisdiction. (*Seymour* vs. *Delancy and others,* 6 *John. Ch. R.,* 222.) If its specific performance is refused, the party loses no right, for the only remedy to which the party has a right, is his remedy at law for damages for the breach of contract.

An agreement (even in writing,) must be certain, specific, mutual, and for an adequate consideration to be specifically performed. (1 *Mad. Ch. R.,* 423; *Parhurst* vs. *Van Cortland,* 1 *John. Ch. R.,* 273; *Benedict* vs. *Lynch, Id.,* 370.) Where the agreement is uncertain, the court will refuse a specific performance. (1 *Mad. Ch. R.,* 426; 2 *S. and Lef.,* 7, 553; *Newland on con.,* 151; *Brownly* vs. *Zeffrees,* 2 *Vernon,* 415.) Where there is any doubt as to the identity of the lands to which a contract relates, a court of equity ought not to decree a specific performance. (*Graham* vs. *Hendren,* 5 *Munf.,* 185; *Calverly* vs. *Williams,* 1 *Ves. Jr.,* 210.) A contract must be so precise that neither party can misunderstand it, or it will not be specifically performed by chancery, but the parties will be left to their remedies at law. (*Colson* vs. *Thompson,* 2 *Wheat.,* 336.)

Inadequacy of consideration, (even in the absence of all fraud,) is a sufficient reason for refusing a specific performance, for an agreement must be just and fair in *all* its parts, otherwise a specific performance will not be decreed. (*Seymour* vs. *Delancy,* 6 *John. Ch. R.,* 222; *Cletheral* vs. *Ogilvie,* 1 *Dessau.,* 275.) A court of chancery will refuse a specific performance where the price of sale is very low. (1 *Mad. Ch.,* 425; 3 *Brown C. C.,* 228; 2 *Cox,* 77; *Newland on contracts,* 66; 10 *Ves.,* 592; 1 *Ves.,* 279; *Fonblan Eq.,* 234; 3 *Ves. and Beam,* 192–3.) Even a contract will be rescinded and conveyance set aside for inadequacy of consideration. (*Sugden law of vendors,* 170,-171;

First Circuit. 2 *Brown's C. C.*, 150; 1 *Vernon*, 465; 1 *Brown's C. C.*, 176;

Burtch *vs.* Hogge.

6 *John. Chan. Rep.*, 222.) Inadequacy of price is often (even in the absence of all fraud) the ground of refusing a decree for specific performance, though not sufficient of itself to induce the court to set aside an executed agreement, but the court will leave the parties to their remedy at law. (*Osgood vs. Franklin*, 2 *John. Chan. R.*, 23; 14 *John. R. on appeal*, 527; 1 *Vern.*, 472; *Awbry vs. Keen, Chan. Cas.* 19; 1 *Dessau.*, 250.) Nor will a court of chancery decree a specific performance against a widow entitled to dower. (*Sugden law of vendors*, 142.)

But where an agreement is certain and for an adequate consideration, to be specifically performed by the decree of a court of chancery, it must be in accordance to the forms prescribed by law. (1 *Mad. Chan.*, 372; 3 *Ves.*, 420; 3 *Atkins*, 385; 1 *Vesey*, 279; 1 *Eden.*, 323.) The statute requires all agreements touching lands to be in writing. In this, equity follows the law. A letter or receipt may be sufficient writing within the statute; but it must specify all the terms of the contract. The most trifling omission is fatal; (*Sugden law vendors*, 45, 48;) for an agreement cannot rest partly in writing and partly in parole. (1 *John. Ch. R.*, 131, 272.) It is insisted that the case in hand is taken out of the operation of the statute by part performance; this exception (of part performance) to the operation of the statute is viewed with extreme jealousy, and properly so, by courts, as tending to relax a salutary rule of law, and open a door for all the frauds the statute was intended to guard against. (*Foster vs. Hale*, 3 *Ves.*, 712, 382.) Part or full payment of the purchase money, (even on full and distinct proof of parole agreement,) is not such a compliance with the spirit of the statute as a court of chancery will recognize and carry into execution. (1 *Mad. Ch.*, 381; 2 *Des.*, 190; *Lord Pangall vs. Ross*, 2 *Equity Ab.*, 46; *Leah vs. Morris*, 2 *Chan. Ca.*, 135; *vide. Lord Redesdales remarks* in the case of *Clenan vs. Cook*, 1 *Sch. and Lef.*, 40.) Where, he says, payment of purchase money will in no case amount to a part performance, nor will giving directions for

conveyances, deeding estate, &c., take a case out of the sta-
tute. (*Clark* vs. *Wright*, 1 *Ath.*, 12; *Whaley* vs. *Bagnall*, 6
*Brown C. C.*, 45; *Gwins* vs. *Calder*, 2 *Dessau.*, 190.)

To take a case out of the operation of the statute on the ground of part performance, the existence of the contract as laid in the bill must be made out by clear and unequivocal proof, and the acts of part performance must be of the identical agreement set up. (*Phelps* vs. *Thompson*, 1 *John. C. R.*, 131, 149; *Parhurst* vs. *Van Cortland*, 273, 284-5.) It is not sufficient that the act is evidence of some agreement, but it must show unequivocally, the existence of the particular agreement set forth in the bill, and that that very agreement was in part executed. (*Lindsay* vs. *Lynch*, 2 *Schols. and Lef.* 8.)

W. WOODBRIDGE.—*Certainty* in a contract is essential; if uncertain, a specific execution will be refused. (1 *J. C. R.*, 273, 131; 14 *Johns. R.*, 15; 7 *J. C. R.*, 13; 1 *Mad.*, 336-7; 1 *Vern.*, 406; 5 *Munf.*, 185.)

Equity will not compel a specific execution, unless when essential to justice. (*Mitf. Pl.*, 119.) A hard bargain merely, therefore, will not be opened, especially as to infant heirs.

"Already have so many cases been taken out of the statute of frauds, which seem to be within its letter, that it may well be doubted whether the exceptions do not let in many of the mischiefs, against which the statute was intended to guard.

The best judges in England have been of opinion that this relaxing construction of the statute ought not to be extended further than it has already been carried, and this court entirely concurs in that opinion." (4 *Cranch*, 224; 2 *Peters Cond. Rep.*, 96; 1 *Mad.*, 302-3; 3 *Ves.*, 712; 6 *Ves.*, 32, 37; 5 *Munf.*, 185, 318.) In such cases the complainant should be left to seek his remedy at law. (1 *Wheat.*, 197.)

Part performance implies a fraud on the opposite party. (*See Story's Eq.*, 66, 74; 1 *J. C. R.*, 149.) Payment is no part performance. (2 *Story's Eq.*, 64-5; 5 *Munf.*, 317.)

THE CHANCELLOR.—The bill in this case is filed to compel

First Circuit.
Burtch
vs.
Hogge.

the specific performance of a special contract to convey land. Two questions arise for the consideration of the court.

*First.* Has there been such a contract proved as will enable this court to decree a specific performance? and,

*Second.* Has there been such a part performance as will take the case out of the statute of frauds.

That there was an agreement or contract for the sale of some portion of, or interest in the McNiel tract (so called) at the mouth of Black river, in St. Clair county, by Robert Hogge to Jonathan Burtch, cannot admit of a doubt. Several receipts have been produced by Burtch, in which Hogge acknowledges the receipt of money to apply as payments on the land sold by him to Burtch. Although these written receipts do not show what the contract was, they are evidence of some contract between the parties respecting the sale and purchase of land; and it is pretty clearly shown by Hogge's acknowledgments, that he had sold to Burtch his undivided interest of between seven and eight acres of land in the McNiel tract, (reserving to himself one half acre,) for the sum of $150.

Testimony on the part of the complainant.

*William H. Carleton* states, that he "heard Hogge say in 1832, that he had sold all his lands at the mouth of Black river, except half an acre, to Burtch, who had pretty much paid all up for the same." Previous to this, heard Hogge saying "that he had bought at the mouth of Black river, seven acres or seven acres and some hundredths of an acre."

*Harman Chamberlain* states that he received $45 from Burtch in July, 1832, to pay to Hogge for land purchased by Burtch formerly from Hogge, which he paid accordingly. Proves the execution of Hogge's receipt for $85; also a receipt for $36, and two receipts for $23, by Hannah Hogge. Heard Hogge say "that he had sold a part of his interest in his lands at Black river, about seven acres, to Burtch; understood it to be of the lands purchased by him from E. P. Hastings. This was in the fall or winter of 1831." That Burtch was in possession before the death of Hogge; that Burtch has erected upon said land, since the death of Hogge, a store, tavern-house and one

barn, the value of which he believes to be about $2,500—and were erected from 4 to 5 years since; that Hannah Hogge asked him whether she had a right or ought to give a deed to Burtch of the land, she being the administratrix; that Hogge's deed was given to Burtch to take to Detroit to have the necessary papers made out to obtain a deed; that Burtch has continued in possession, where he built, ever since; that Hogge when he purchased of Hastings, supposed that he had purchased 30 acres, and was then ignorant of the Masten claim; understood that the sale from Hogge to Burtch consisted of seven acres, and that it was an undivided interest; estimates the seven acres in 1831, at $500; considered Hogge an intelligent man and as capable of estimating the worth of property as most men.

*Israel Carleton* testifies that Hogge told him, that he had purchased a part of the McNiel tract in company with a Mr. Sales; has heard him say that he had sold his interest, except half an acre, to Burtch, and had made about $90 in the trade; heard him say this in various conversations in 1832; the lands referred to are near the mouth of Black river; testifies to the payment of $40 on the purchase, and proves the receipts of Robert and Hannah Hogge; that the land sold to Burtch by Hogge, was an undivided interest, reserving half an acre.

*Edmund Carleton* says, that in the summer of 1832, in conversation with Hogge respecting a payment to be made by him and Hogge jointly, Hogge stated that he expected to receive $80 or $90 from Burch, in part payment for some lands sold him at the month of Black river; said that the lands were undivided, that he, Hogge, had reserved half an acre.

*Ira Porter* testifies that he heard Hogge speak of his purchase in December, 1831; that the interest was an undivided interest, and purchased jointly with Edward Sales, and was a portion of the McNiel tract, situated at the mouth of Black river; sometime in January or February, or there about, of 1832, Hogge, in conversation with Harrington and others, said that he had sold out his interest in the McNiel tract to Burtch,

reserving half an acre, for $140 or $150; in the spring of 1832, Hogge requested him, Porter, to make out a conveyance, and he did so accordingly, and gave it to Hogge; it was prepared in exact accordance with Hogge's instructions, and was read to him, and no fault found with it; he paid witness for drawing it; estimates the value of improvements made by Burtch and his assignees, between the date of the purchase and the commencement of this suit at between $1,800 and $2,500; Burtch and his assigns, have been in possession ever since the purchase; thinks the white store was erected after the date of the deed; Burtch rented to Sampson.

*John S. Heath* says that in June or July, 1832, he had a conversation with Robert Hogge, who then told him that he had formerly an interest in six or seven acres of land at the mouth of Black river, but had sold the same to Burtch, reserving half an acre.

*Jeremiah Harrington* testifies that in the year 1832, Robert Hogge told him that he had sold to Burtch, all but half an acre of the land which he had bought in the McNiel tract, and had received his pay in full for it; it was from seven to eight acres; had two conversations with Hogge, in which he said the same thing.

*Jacob Miller* states, that 1832, he had a conversation with Hogge about the purchase of half an acre of land. Hogge told him he had sold to Burtch, his land in the McNiel tract, reserving half an acre; thinks it was seven acres which Hogge said he had sold; Hogge said he had received some part of his pay; had more than one conversation with him on the subject, one of which was in May, 1832; knows that Burtch was in possession of *some part* of the McNiel tract a year before this conversation.

*John Thorn* states, that Robert Hogge called upon him to make out a deed to Burtch for some portion of the McNiel tract, and had his papers with him. It was some certain interest with the reservation of half an acre; Hogge refused to leave the papers on account of the price the witness would

charge for making the deed; Hogge's deed was from Eurotas P. Hastings, who derived title from Sibley and Kearsley.

*Defendant's* witness.

*John Thorn* testifies, that he had a conversation with Hogge in 1831 or 1832, about making out a deed from him to Burtch, for some certain interest which he had sold to Burtch in the McNiel tract, at the mouth of Black river; it was an undivided interest which Hogge wished to convey; that Hogge produced the patent to Solomon Sibley, and a transfer by Sibley, and also by Jonathan Kearsley as the administrator of the estate Edward Prucell, to E. P. Hastings, and a transfer from Hastings and wife, to Hogge; that he, Thorn, could not understand from Hogge how much interest he wished to convey to Burtch; that Hogge intended to reserve something more than half an acre; that Hogge gave him to understand, that the reservation which he wished to make was subject to litigation for the reason that he, Hogge, had been induced to believe, by those of whom he purchased, that he had purchased a sixth instead of a third part; that he, Thorn, advised Hogge that it appeared from his papers that he had purchased a third instead of a sixth part; that he, Thorn, did not make out the deed in consequence of the uncertainty of the amount of interest to be conveyed and the price which he charged for making the proper investigation and the deed; that Burtch was living on the McNiel tract previous to Hogge's purchasing any interest therein; that he estimates the value of the land in the McNiel tract in 1832, with a clear title, at $10 per acre; at this time $500 per acre.

On his cross-examination says: the original patent of the McNiel tract, containing about ninety acres, was to Solomon Sibley; it appeared by the papers shown by Hogge, that Sibley purchased for himself and two others; that one of them was Edward Prucell; that Prucell's interest appeared to have been sold to E. P. Hastings, by Kearsley, who was Purcell's administrator; that Sibley's interest also had been sold to Hastings; that Hogge derived his title through Hastings; that after Hogge had purchassed Prucell's third, as he supposed,

and paid his money therefor, those from whom he had purchased endeavored to persuade him that he had purchased only a sixth instead of a third; Hogge said the reason given by the persons from whom he derived title, why he had not purchased a third, was, that Prucell had sold a part of his interest to Masten; that he, Thorn, saw the original articles of agreement between Prucell and Masten, at General Larnard's office, in Detroit, subsequently to Hogge's purchase; that he believes the articles were signed by both Prucell and Masten; it was an agreement to convey half of Prucell's interest in the McNeil tract, and the one half of other lands.

It is proven by several witnesses that Hogge, in his life time, stated that he had sold about seven acres; and nearly all the witnesses speak of this as the quantity, reserving to himself half an acre.

Thorn says that he did not understand what the interest was which was reserved; that it was half an acre and something more, and that it was subject to litigation. I think Thorn's deposition, together with the testimony of the other witnesses, explains the difficulty.

It appears that nearly all the witnesses understood the interest sold to have been seven acres. From the deposition of Israel Carleton it appears that the purchase was made by Hogge and a Mr. Sales; from the deposition of Mr. Thorn, that it was a matter of doubt and dispute whether they had purchased the one third or one sixth. They at first supposed it to have been one-third, but it afterwards appeared that there was an outstanding contract made by Prucell, to convey one half of his interest to a man by the name of Masten. This, I think, explains the seeming discrepancy, and shows clearly that the understanding of the witnesses that the interest which was to be conveyed, was seven acres, and that the reservation was to be something more than the half acre, and that it was subject to litigation. And Hogge's objection to signing the deed is also explained.

It is hardly possible that so many witnesses can be mistaken as to the amount of interest to be conveyed. It is apparent to

my mind that Hogge intended to convey to Burtch the seven acres; to reserve to himself all the right which he had to the other sixth, claimed by Masten. The land containing ninety-one acres and forty-one hundredths, it seems by the testimony, was originally divided into three shares, making thirty-one acres and forty-six hundredths each. One half of this share, which was asserted to belong to Hogge, as appears by Thorn's deposition, had been contracted to Masten by Prucell, which would leave, if the contract should prove a valid one, fifteen acres and twenty-three hundredths as the part belonging to the estate of Prucell. This, it appears, was purchased by Hogge and Sales together. This, then, would leave, without reference to the disputed one-sixth, alledged to have been contracted to Masten, the seven acres testified to by the witnesses, and the reservation of the half acre and a small fraction over, to Hogge. And this substantially and satisfactorily explains the whole of the evidence.

From all the evidence in the case, I think it clear that Hogge had sold his undivided interest of seven acres in the McNiel tract to Burtch, reserving to himself all over the seven acres, supposing it to be about a half an acre.

*Second.* As to the part performance.

It appears clearly by the proofs in this case, that a principal part of the purchase-money was paid to Hogge in his lifetime, and that the balance was paid to Hannah Hogge, his widow, who was administratrix of his estate, soon after his death.

The question, whether the payment of the purchase-money, is such a part performance of a parole contract to convey land, as will take it out of the statute of frauds, seems to be as yet unsettled. But the case does not turn on this point alone. It has. been proved that Burtch was in possession of a portion of the McNiel tract at the time he purchased of Hogge, and that he has ever since remained in possession; that he had made valuable improvements on the same after his purchase from Hogge, and before the commencement of this suit; that these improvements were worth from $1,800 to $2,500.

There is some doubt, perhaps, as to the time some portion

First Circuit. of the improvements were made; but that the most valuable
and expensive were made after the purchase by Burtch from
Hogge, there can be no doubt.

Burtch
vs.
Hogge.

The payment of the purchase money, the possession, and
the improvements made by Burtch since the purchase, I think,
are clearly sufficient to take this case out of the statute of
frauds.(1)

It has been urged that there was such an inadequacy of price
that this court will not decree a specific performance.

Inadequacy of price, where it is so gross and palpable as of
itself to afford evidence of actual fraud, may be sufficient to
induce this court to stay the exercise of its discretionary pow-
er to enforce a specific performance, and leave the party to
his remedy at law; but inadequacy of price *merely*, without
being such as to prove fraud conclusively, is not a good objec-
tion against decreeing a specific performance. (*See Seymour*
vs. *Delancy, on appeal, 3 Cowen, 445,*) where all the authori-
ties upon this subject are collected.

The value must be taken at the time the contract was made.

There is some discrepancy in the testimony as to the value
of the land at that time. Chamberlain, in his testimony, esti-
mates its value in 1831 at $500. Thorn, in his deposition taken
by the defendants, estimates the lands in this tract in 1832,
with a clear title, at $10 per acre, making $70 for the seven
acres. The price agreed upon was $150. Where witnesses
vary so much, with equal opportunities of judging, it would
certainly be going very far for this court to come to the con-
clusion that there is any such inadequacy in the price, which
the parties themselves have agreed upon, as to amount to fraud,
when it appears, too, that Hogge sold at an advance, although
he only retained the lands from December to May following.

(1) See 2 *Story's Eq.*, 62, 76; *Miller* vs. *Hawler*, 2 *Rawle*, 53; *Eckert* vs. *Eckert*, 3; *Penns.*, 332; *Stewart* vs. *S'ewart*, 3 *Watts*, 258; *Wilbur* vs. *Paine*, 1 *Ham.*, 253; *Waggoner* vs. *Speck*, 3 *Ham.*, 293; *Moore* vs. *Bearsley*, 3 *Ham.*, 298; *Marks* vs. *Pell*, 1 *Johns. Ch.*, 594; *Strong* vs. *Stewart*, 4 *Johns. Ch.*, 167; *Washburn* vs. *Merrills*, 1 *Day*, 139; *Daniels* vs. *Alvord*, 2 *Root*, 196; *Ross* vs. *Now-ell*, 1 *Wash.*, 15; *Watkins* vs. *Stockett*, 6 *Har. & McHen.*, 24; *Wilcox* vs. *Morris*, 1 *Murph.*, 117; *Wilcox* vs. *Carver*, 1 *Hayw.*, 93; *Belton* vs. *Avery*, 2 *Root*, 279; *Wheeland* vs. *Swartz*, 1 *Yates*,279 ; *Mackey* vs. *Brownfield*, 13 *Serj. & Rawle*, 239; *Crocker* vs. *Higgins*, 7 *Conn.*, 342; *Cabot* vs. *Has-kins*, 3 *Pick.*, 95; *Freeport* vs. *Bartol*, 3 *Greenl.*, 340; *Downey* vs. *Hotchkiss*, 2 *Day*, 225; *Wet-more* vs. *White*, 2 *Caine's Ca.*, 87, a leading case; *Phillips* vs. *Thompson* 1 *Johns. Ch.*, 131; *Townsend* vs. *Sharp*, 2 *Overton*, 192; *Hickman* vs. *Grimes*, 1 *Marsh.*, 86; *Thompson* vs. *Todd*, 1 *Peters S. C.*, 385; *Bassler* vs. *Niesley*, 2 *Serg. & Rawle*, 355; *Jones* vs. *Peterman*, 3 *Serg. & Rawle*, 546; *Meach* vs. *Stone*, 1 *Chipman*, 182.

The prayer of the bill must be granted or refused. Here is payment for the lands, all the possession of which the subject matter was capable, and an expenditure, according to the testimony of Chamberlain, of $2,500, and according to Porter's deposition, of from $1,800 to $2,500.

The fact that the lands on which the improvements were made were undivided, would, perhaps, be entitled to some consideration. But it is not to be believed that Burtch made these expensive improvements without reference to his interest in the lands, relying upon obtaining an allowance therefor on a division with the other owners. There may be some doubt as to whether the eleven hundredths over the half acre were to be retained by Hogge, or conveyed to Burtch. But the witnesses most of them, designate the quantity at seven acres, and as the remainder would be so near the half acre, it would naturally be mentioned as a half acre.

The decree must be for a conveyance(2) of Hogge's undivided interest in the McNiel tract, of seven acres, to the complainant, reserving to the heirs and legal representatives of Hogge, all other right, title and interest which they may have in said tract, and without prejudice to the right of dower therein of Hannah Doran, late Hannah Hogge.

---

(2) The cases and their varieties are numerous in which courts of equity have compelled the performance of parol agreements to convey lands, and refused so to do. The earlier cases have been collected and well digested in a note to Fonblank's Eq., (1 *Fonbl. Eq.*, 29.) The later cases have been collected in a note to the third American edition of Mitford's Pleadings. (See *Mit. Pl.*, 119.)