**Affirmed and Memorandum Opinion filed May 6, 2014.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00713-CV

**BYRON KEITH HARMON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from 351st District Court**
**Harris County, Texas**
**Trial Court Cause No. 1355981**

## M E M O R A N D U M   O P I N I O N

A jury convicted Byron Keith Harmon of aggravated robbery[1] and the trial court assessed his punishment at 35 years' confinement. Appellant challenges his conviction contending that (1) the evidence is legally insufficient to prove he committed the offense; (2) his trial counsel was ineffective for failing to file a motion to suppress or object to an out-of-court identification; (3) the trial court

---

[1] See Tex. Penal Code Ann. § 29.03(a)(3)(A) (Vernon 2011).

erroneously failed to instruct the jury "on the unreliability of eyewitness identification;" and (4) the trial court unlawfully assessed court costs. We affirm.

## Background

Appellant was charged with aggravated robbery of the 69-year-old complainant, Loi Phan. A jury trial was held from July 31, 2012 to August 1, 2012.

At trial, Deputy Mark Gustafson testified that he was called "for an aggravated robbery carjacking at the Shell station at Mount Houston and the Eastex Freeway" on September 12, 2011. He testified that he arrived at the gas station at 10:15 p.m. after the complainant's relative had called the police at 10:13 p.m. to report that the complainant had been robbed. Gustafson testified that the complainant was very excited, upset, and spoke "very, very little English . . . if any."

Gustafson was able to "figure out" that the complainant was rear-ended while he was stopped at a red traffic light at the intersection of Mount Houston and the Eastex Freeway by a "large black male" wearing a black shirt and a "small black male" wearing a white shirt. After the collision, one of the men hit the complainant and the other man got into the complainant's car and drove away. Gustafson testified that the complainant's description of the men was vague, but Gustafson was able to "get the full make and model of [the complainant's] vehicle" and forwarded that information to dispatch.

Gustafson testified that less than two hours later he was informed by dispatch that the complainant's car had been stopped by police officers based on a "LoJack hit"[2] at Airline Drive and Rittenhouse Street, and that two males, who had

_____

[2] A LoJack is a security system and location device that is placed in vehicles. Some police cars

2

been in the stolen car, had been detained.  Gustafson testified that when he arrived at the scene he saw the taller of the two detained males was black, and the shorter male was Hispanic with medium-brown skin who in the dark "could have been mistaken to be a light black male."  Appellant was one of the males detained, and the other male was Ezquiel Valdillez.  Gustafson testified that he recalled appellant was wearing a black t-shirt when he arrived at the scene, but Gustafson acknowledged that he could have been mistaken about the shirt color.  Gustafson confirmed that a photo taken of appellant after Gustafson had taken appellant to jail showed that appellant was wearing a white t-shirt, and that appellant had no chance to change shirts.

Police officer Scott Peak testified at trial that he stopped the complainant's car at approximately 11:45 p.m. on September 12, 2011, after he received a signal from a LoJack device in his patrol car.  Peak stopped the stolen car and detained appellant and Valdillez.   Peak testified that when he "pulled in behind" the stolen car appellant was driving, appellant did not try to take any evasive action, "try to run from" Peak, or give Peak "any problems at the time of the arrest."  Peak testified that he handed over the investigation to Gustafson as soon as Gustafson arrived at the scene.

The complainant testified at trial through an interpreter.  He testified that he has difficulty hearing due to an ear injury he sustained a long time ago; he explained that he has difficulty speaking and his voice is "pretty raspy" because he had throat cancer.  The complainant testified that he was driving home from his nephew's store and was stopped at a red traffic light at the intersection of Mount

_____

are outfitted with LoJack monitors that pick up signals emitted from vehicles containing a LoJack.  The monitor will reveal a code which is matched up with a specific vehicle license plate, make, model, color, and any other relevant vehicle information.  Equipped with this information and an increasing signal emitting from the LoJack, the police are able to locate a stolen vehicle.  This is referred to as a "LoJack hit."

Houston and the Eastex Freeway when another car crashed into his car. He exited his car and saw one "really tall" and one short black male jump out of the car that rear-ended him. He testified that the tall male immediately started hitting him in the head, and the short male drove off with his car. The complainant testified that he managed to run away to a nearby gas station and called his nephew to call 9-1-1 because he "can't speak very well."

The complainant testified that a police officer arrived at the gas station, and he was able to relate information to the police officer through his nephew who was there to translate for him. The complainant testified that he understands English "a little bit" but a person has to "speak extremely, extremely slow for [him] to understand." He stated that a police officer visited him at his home. The police officer brought two photo spreads with him — State exhibits 1 and 2. The complainant could not confirm that he was given any instructions regarding the photo spreads. The complainant stated that there was no one at home who could translate for him, but he was able to communicate with the police officer.

He testified that he identified Valdillez immediately as one of the men on the first photo spread (State exhibit 1) and therefore signed his name next to Valdillez's photo. He acknowledged that he could not identify appellant on the second photo spread (State exhibit 2) the police officer showed him. The complainant testified that he was called to the police station several days later to look at a live line-up. He stated that the live line-up consisted of six males, and that he identified the male who hit him the night of the robbery. The complainant testified that he was sure the male he identified in the live line-up was the person who hit him. The complainant could not identify appellant in court as one of the robbers and stated that "if he doesn't have the shirt, I don't remember."

During cross-examination, the complainant testified that he did not

4

remember what color shirts the men were wearing and did not remember telling the investigating police officer about the men's shirt colors. He testified that he only could identify appellant in the live line-up, and that he told the police officer that he recognized appellant's face. The complainant stated that there was no interpreter at the police station during the live line-up, and that his nephew was there to translate for him. Complainant was asked at trial: "Just so I'm clear, as we sit here today, you can't say this is the man that hit you?" He responded, "The other guy is skinnier, skinnier."

Sergeant Robert Minchew, who was assigned to investigate the robbery, testified at trial that he used appellant's and Valdillez's booking photos to assemble two computer-generated photo spreads. Minchew testified that he and his partner visited the complainant at his home four days after the robbery to show complainant the two photo spreads. Minchew testified that Deputy Gustafson had told him that the complainant "spoke limited English or there was a translation problem, but [Minchew] didn't know [the complainant] was — [the complainant] was strictly Vietnamese or almost Vietnamese only." Minchew stated that he and his partner did not speak Vietnamese, did not bring an interpreter, and had "a lot of trouble communicating" with the complainant. He acknowledged that the complainant was unable to read the instructions that are usually given before a photo spread is shown.

Minchew testified that the complainant immediately identified Valdillez in State exhibit 1 as the male who took his car and then signed his name next to Valdillez's photo. When Minchew showed the complainant State exhibit 2, the complainant studied the photo spread for about 30 seconds; pointed to photo #1 and photo #6 as if he could not decide between the two photos; and then made a shrugging gesture. Minchew stated that appellant was pictured in photo #6.

5

Minchew stated that he considered the complainant's identification to be a tentative one "that needs more — a lot more than just the photo line-up." Minchew testified that he asked the complainant's daughter to bring the complainant to the police station for a live line-up because he wasn't "happy with the photo line-up."

Minchew testified that the complainant came with his daughter to the police station for the live line-up and that she was there to translate for him. Minchew instructed the complainant through his daughter not to be scared because the males in the line-up could not see him, and to "sit back and relax and watch all five inmates, try not to say anything or do anything" until the line-up is completed. Minchew testified that four males with physical characteristics similar to appellant's were chosen for a live line-up; appellant was given the choice of which of the five positions he wanted to stand in during the line-up; appellant chose to stand in position #1; the video camera was turned on to videotape; and the police officer called out instructions to each of the males in the line-up to step forward and make slow turns. A videotape of the live line-up was admitted into evidence as State exhibit #3 and played for the jury; the line-up took place on September 20, 2011.

According to Minchew, the complainant said "number one" to his daughter at the start of the line-up and stared at appellant in position #1 "for quite a while until everybody started doing their turns. And then as soon as it was over and the fifth inmate stepped back, he starts saying: Number one again. Number one, number one, number one." Minchew also testified that the complainant was "ringing his hands and he was clenching his fists repeatedly and he would close his eyes and open them back up, but he just continued to look at number one off and on." Minchew considered the complainant's identification of appellant to be a

6

positive one. Minchew also testified that appellant's appearance had changed between September 2011 and the time of trial because appellant had "maybe gained 30 to 40 pounds, maybe 30" and "got some facial hair."

During cross-examination, Minchew acknowledged that there are several written instructions he normally gives a person before showing a photo spread, and these instructions are initialed by the person. Minchew did not have a copy of these instructions with him in court but discussed the following four he could remember: (1) "not to assume that the — the person who — or the suspect in this case is in the photos" on the photo spread; (2) "this case does not hinge or does not rely solely on your photo identification;" (3) "not feel that you need to pick out anybody;" and (4) "not speak about this photo line-up to anyone else that may be related to the case." Minchew acknowledged that none of these written instructions were given to the complainant before he was shown the photo spreads.

Minchew also testified that the complainant "emphatically picked out Valdillez;" the complainant did not definitively pick out appellant from the photo spread but instead pointed to appellant's photo and another person's photo. Minchew acknowledged not knowing what the complainant meant when he pointed to two photos because Minchew does not speak Vietnamese and the complainant does not speak English. Minchew testified that did not believe the live line-up was suggestive; he acknowledged that appellant was the only person whose photo appeared in the photo spread shown to the complainant and who also appeared in the live line-up.

A jury convicted appellant of aggravated robbery, and the trial court assessed appellant's punishment at 35 years' confinement. The trial court certified appellant's right to appeal, and appellant filed a timely notice of appeal.

**Analysis**

## I. Sufficiency of the Evidence

Appellant argues in his first issue that the evidence was insufficient to support his conviction because the State could not prove beyond a reasonable doubt that he was one of the two men who committed the aggravated robbery in this case.

We must address sufficiency challenges regardless of our disposition of the other issues in a case. *See Graham v. State*, 643 S.W.2d 920, 924 (Tex. Crim. App. 1981). Accordingly, we begin our analysis by examining appellant's first issue.

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether a rational jury could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). In making this review, an appellate court considers all evidence in the record, whether it was admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). This standard of review applies to cases involving both direct and circumstantial evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

The jury is the exclusive judge of the credibility of witnesses and the weight of the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We defer to the jury's responsibility to fairly resolve conflicts in the evidence, and we draw all reasonable inferences from the evidence in favor of the verdict. *Id.*

8

Therefore, the testimony of a single eyewitness can be enough to support a conviction. *Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006).  In addition, because it is the sole judge of the weight and credibility of the evidence, the jury may find guilt without physical evidence linking the accused to the crime. *See id.*  In conducting a sufficiency review, we do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.  Tex. Penal Code Ann. § 29.02(a)(2) (Vernon 2011).  A person commits aggravated robbery if he commits robbery and causes bodily injury to another person or threatens or places another person in fear of imminent bodily injury or death, if the other person is 65 years of age or older.  Tex. Penal Code Ann. § 29.03(a)(3)(A) (Vernon 2011).

Appellant argues that the evidence was insufficient to prove beyond a reasonable doubt that appellant was the person who committed aggravated robbery because the complainant (1) could not positively identify appellant on the photo spread police showed him and pointed to two photos on the photo spread; (2) was not given any instructions by police before he was given the photo spread; (3) identified appellant in a live line-up, but appellant was the only person who appeared in both the photo spread and the live line-up; and (4) could not identify appellant in court.  Appellant also points to inconsistencies in testimony regarding whether appellant wore a white or black t-shirt during the robbery, and whether the complainant's nephew or daughter accompanied him to the live line-up at the

9

police station.  We disagree and hold that the evidence in this case is legally sufficient to prove appellant was the person who committed aggravated robbery.

The complainant tentatively identified appellant on a photo spread four days after the robbery.  Shortly thereafter, the complainant positively identified appellant in a live line-up at the police station.  He testified that he was sure that the male he identified in the line-up was the person who hit him during the robbery.  He testified that he got a "good look" at both men, and told Sergeant Minchew at the police station that he remembered appellant's face.

The complainant was not able to positively identify appellant in court during trial; he indicated his assailant was "skinnier."  Minchew testified that appellant's appearance had changed between the time of the robbery and trial because appellant had "maybe gained 30 to 40 pounds, maybe 30" and "got some facial hair."  Minchew testified that the complainant had tentatively identified appellant on a photo spread, and positively identified Valdillez on a photo spread.  Minchew testified that the complainant positively identified appellant in a live line-up.

According to Minchew, the complainant said "number one" to his daughter at the start of the line-up and stared at appellant in position #1 "for quite a while until everybody started doing their turns.  And then as soon as it was over and the fifth inmate stepped back, he starts saying: Number one again.  Number one, number one, number one."  Minchew also testified that the complainant was "ringing his hands and he was clenching his fists repeatedly and he would close his eyes and open them back up, but he just continued to look at number one off and on."  Minchew characterized the complainant's reaction as "a typical reaction for someone who's been in a — been in something like a robbery and they're that close to the defendant.  It just brings back all those memories.  Kind of like a post-traumatic stress disorder or something similar where they're reliving the incident."

10

Evidence also established that appellant and Valdillez, the second man whom complainant "emphatically picked out" in a photo spread, were stopped in the complainant's car two hours after the robbery. Appellant claims that it is "well known that stolen cars get passed around a lot in the neighborhood where this incident occurred;" this assertion is contradicted by Minchew's testimony. Minchew testified that "if you have a two to three-day gap between the stolen car and the recovery, then there's no telling how many times it's changed hands, but whenever the car is found, almost immediately then, you know, that gives more weight to the — to the belief that the people in the car are the ones that took the car."

That the complainant may have been mistaken regarding whether his nephew or his daughter accompanied him to the police station to translate during the live line-up goes to credibility, which is a matter for the jury to determine. The jury likewise was able to assess credibility in light of complainant's inability to identify appellant at trial as his assailant, and the proffered explanation that appellant's appearance had changed significantly by the time of trial. Equally a matter of credibility is Deputy Gustafson's testimony that he recalled appellant wearing a black t-shirt at the time of his arrest while acknowledging that this memory could be mistaken because appellant's booking photo showed appellant wearing a white t-shirt.

The determination of the weight to be given to testimonial evidence rests within the jury's sole province because it turns on an evaluation of credibility and demeanor. *Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The jury is free to believe or disbelieve all or any part of witnesses' testimony. *Id.* Viewing all of the evidence in the light most favorable to the verdict, we conclude that a jury reasonably could have found that the evidence was

11

legally sufficient to establish beyond a reasonable doubt that appellant was the person who committed aggravated robbery.

We overrule appellant's first issue.

## II.   Ineffective Assistance

Appellant argues in his second issue that his trial counsel was "ineffective for failing to move to suppress, or object to, out-of-court identification, because the identification technique was unconstitutionally suggestive."

The Sixth Amendment to the United States Constitution, and section ten of Article 1 of the Texas Constitution, guarantee individuals the right to assistance of counsel in a criminal prosecution. *See* U.S. Const. amend. VI; Tex. Const. art. 1, § 10. The right to counsel requires more than the presence of a lawyer; it necessarily requires the right to effective assistance. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). The right does not provide a right to errorless counsel, but rather to objectively reasonable representation. *Id*.

To prevail on a claim of ineffective assistance of counsel, an appellant must meet the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted two years later in *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). *Lopez*, 343 S.W.3d at 142. Appellant must show that (1) trial counsel's representation fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced his defense. *Id*. Unless appellant can establish both prongs, an appellate court must not find counsel's representation to be ineffective. *Id*.

In order to satisfy the first prong, appellant must prove by a preponderance of the evidence that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id*. To demonstrate

12

prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Riley v. State*, 378 S.W.3d 453, 458 (Tex. Crim. App. 2012).

"An appellate court must make a 'strong presumption that counsel's performance fell within the wide range of reasonably professional assistance.'" *Lopez*, 343 S.W.3d at 142 (quoting *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)). An ineffective assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012). It is insufficient for appellant to show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence. *Lopez*, 343 S.W.3d at 142-43.

Direct appeal usually is not an adequate vehicle for raising an ineffective assistance claim because the record often is undeveloped. *Menefield*, 363 S.W.3d at 592-93. This is true with regard to the question of deficient performance, when counsel's reasons for failing to do something do not appear in the record. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Trial counsel ordinarily should be given an opportunity to explain his actions before being denounced as ineffective. *Menefield*, 363 S.W.3d at 593. Absent such an opportunity, the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Id.*

Appellant argues that his trial counsel was ineffective because he failed to file a pretrial motion to suppress and failed to object during trial to "testimony about the live line-up or the video of the live line-up" on the ground that the pretrial identification procedure used by the police was unduly suggestive. The

13

record is silent regarding trial counsel's trial strategy.

A trial counsel's failure to file a motion to suppress or object to admission of evidence is not per se ineffective assistance of counsel. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984); *Wert v. State*, 383 S.W.3d 747, 753 (Tex. App.—Houston [14th Dist.] no pet.). To satisfy the *Strickland* test and prevail on an ineffective assistance claim premised on counsel's failure to file a motion to suppress, "an appellant must show by a preponderance of the evidence that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction." *Wert*, 383 S.W.3d at 753 (citing *Jackson v. State*, 973 S.W.2d 954, 956-57 (Tex. Crim. App. 1998)). For an appellant to succeed on an ineffective assistance claim premised on the failure to object, he must demonstrate that if trial counsel had objected, the trial court would have erred in overruling the objection. *Oliva v. State*, 942 S.W.2d 727, 732 (Tex. App.—Houston [14th Dist.] 1997), *pet. dism'd, improvidently granted*, 991 S.W.2d 803 (Tex. Crim. App. 1998) (citing *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996)).

The ineffective assistance arguments at issue here focus on pretrial identification. A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001).

To determine the admissibility of a pretrial identification, we use a two-step analysis asking (1) whether the pretrial procedure was impermissibly suggestive; and (2) if so, whether the suggestive pretrial procedure gave rise to a very substantial likelihood of misidentification. *Santos v. State*, 116 S.W.3d 447, 455 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *see also Neil v. Biggers*, 409

14

U.S. 188, 198 (1972). If the indicia of reliability outweigh the influence of an impermissibly suggestive pretrial identification, then the identification testimony is admissible. *Santos*, 116 S.W.3d at 451, 455-56; *see Neil*, 409 U.S. at 199.

Therefore, even if the pretrial procedure is found to be impermissibly suggestive, identification testimony nevertheless is admissible if the totality of the circumstances shows no substantial likelihood of misidentification. *See Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.] 2013, no pet.). If the totality of the circumstances indicates that a substantial likelihood of misidentification exists, then admission of the identification of the defendant amounts to a denial of due process. *See Neil*, 409 U.S. at 198-99; *Adams*, 397 S.W.3d at 764.

Relying on this court's opinion in *Santos*, appellant argues that "showing a complainant multiple lineups, without a particular reason to do so, is unduly suggestive." According to appellant, the video line-up in this case was impermissibly suggestive because Sergeant Minchew showed the complainant "two lineups in which only [the appellant's] image recurred. As in *Santos*, the identification procedure was unduly suggestive."

We begin by determining whether the pretrial video line-up procedure was impermissibly suggestive. Suggestiveness may arise from the manner in which a pretrial identification procedure was conducted. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). For example, a police officer may point out the suspect or suggest that a suspect is included in the line-up or photo spread. *Id*. The content of a line-up or photo spread itself may be suggestive if the suspect is the only individual who closely resembles the description given by witnesses. *Id*. An identification may be suggestive based on a single procedure or the cumulative effect of multiple procedures. *Id*.

Even if a pretrial identification procedure may have been suggestive, a defendant must establish by clear and convincing evidence that the procedure was impermissibly suggestive. *See Santos*, 116 S.W.3d at 451, 455-56. To be impermissibly suggestive, "the identification procedure utilized must in some way be so defective as to indicate or suggest the [individual whom] the witness is to identify." *See Ward v. State*, 474 S.W.2d 471, 475 (Tex. Crim. App. 1972). "Suggestiveness must be determined by the circumstances of each case." *Cantu v. State*, 738 S.W.2d 249, 252 (Tex. Crim. App. 1987) (holding that showing a witness several photo spreads containing the same photo of defendant on different occasions was impermissibly suggestive).

Appellant does not argue that the photo spread was suggestive; he argues that the video line-up was impermissibly suggestive because he was the only person who appeared in both the photo spread and the video line-up. Appellant misplaces his reliance on *Santos* to support this contention.

In *Santos*, the police showed robbery victim Luis Paz a videotaped line-up, and Paz tentatively identified the defendant as one of the robbers. *Santos*, 116 S.W.3d at 451. The police then showed Paz a 35-minute home video, which contained seven distinct scenes mainly and prominently featuring the defendant. *Id*. at 452-53. Paz positively identified the defendant after watching the first six-minute scene of the video and continued watching the video in its entirety. *Id*. In some of the video scenes, the defendant was the only person shown for several minutes; in other scenes, the defendant drank from a liquor bottle while driving, and displayed a gun along with a companion. *Id*.

*Santos* recognized that the police found it necessary to show Paz a second image of the defendant but stated that "the means selected brought attention to [defendant] and might have suggested to Paz that the police believed [defendant] to

be the culprit." *Id.* at 453. The court was concerned because the defendant was the only person in the video line-up who also appeared in the home video; the defendant was "featured prominently throughout the home video;" and the defendant's actions in some of the home video scenes suggested that "he is a criminal or a gangster." *Id.* The court concluded that the identification procedure was impermissibly suggestive, and noted that showing Paz the home video was equivalent to showing him "a lone photograph of [the defendant] or a series of lineups in which only [the defendant's] photograph recurred." *Id.*

Here, the complainant tentatively identified appellant as his assailant in a photo spread Sergeant Minchew showed to him four days after the robbery. Several days later, the complainant came to the police station with his daughter to view a live line-up. He was instructed to "sit back and relax and watch all five inmates" until the line-up was completed. Minchew never told the complainant that the suspect was one of the males in the line-up. The complainant positively identified appellant as soon as appellant completed his turns during the live line-up, and confirmed his positive identification after all the other males completed their turns. The complainant testified at trial that he looked at the robbers' faces; he got a "good look" at appellant during the robbery; and he was sure appellant was the person who hit him the night of the robbery.

The five males in the live line-up all were black males of similar age, height, skin tone, and features; all had shaved heads. Unlike appellant, three had facial hair. The males in the live line-up looked similar to the males pictured in the photo spread. The live line-up format did not suggest the individual that the complainant was to identify, nor did the police at any time suggest that the suspect was in the photo spread or the live line-up. Further, the police conducted a relatively short line-up which was less than three minutes long. Appellant was not singled out or

17

prominently featured in the live line-up. Under these circumstances, the identification was not so suggestive that it amounted to "a lone photograph of appellant or a series of lineups in which only appellant's photograph recurred." *See Santos*, 116 S.W.3d at 453.

The facts and circumstances here more closely parallel *Goldberg v. State*, 95 S.W.3d 345 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). In *Goldberg*, the police showed a photo spread to a witness shortly after a murder had occurred. *Id*. at 378. The witness stated that the defendant pictured in one of the photos looked like the person who ran away from the murder scene; the witness stated he could not be sure, but then stated he was 80 percent sure. *Id*. One week after the murder, police met the witness at his house and showed him a videotaped line-up. *Id*. at 378-79. The witness indicated that he was 80 percent sure that the defendant in the videotaped line-up was the person who ran away from the murder scene. *Id*. at 379.

The court rejected the defendant's argument that the videotaped line-up was impermissibly suggestive because the defendant was the only person who appeared in both the photo spread and the videotaped line-up. *Id*. The court distinguished *Cantu* and held that the identification procedure was not suggestive because "the police did not show the same or similar photograph of appellant in both line-ups." *Goldberg*, 95 S.W.3d at 379. The court stated that the witness's first identification was made based on the photo spread, and the second line-up "clearly presented a different image of [defendant] because it was not simply a 'head shot' photograph of [defendant], but a live action, albeit videotaped, image of [defendant] walking through the line-up procedure." *Id*. The court concluded that the identification procedure was not suggestive because "the images presented of [defendant] were sufficiently different." *Id*.

18

Here, the photo spread contained a flat, one-dimensional head shot photo of appellant and five other black males. In the live line-up, appellant and four other black males were shown from the waist up as they walked through the line-up procedure; they turned for the complainant to observe the males' movement and faces, as well as their body height, type, and shape. Further, appellant was wearing a white t-shirt in the photo spread while the other males wore different color t-shirts or polo shirts. In the live line-up, all males were wearing the same orange jump suits. The images of appellant presented to the complainant in the photo spread and the live line-up were sufficiently different so that the identification procedure was not impermissibly suggestive. *See id.*

Based on the facts and circumstances in this case, we conclude that appellant cannot show that the pretrial identification procedure used by the police was unduly suggestive. *See id.*; *see also Benitez v. State*, 5 S.W.3d 915 (Tex. App.—Amarillo 1999, pet. ref'd) (identification procedure was not impermissibly suggestive when complainant was shown two photo spreads containing two different photos of the defendant); *Washington v. State*, No. 01–11–00615–CR, 2013 WL 2299179, at *5-6 (Tex. App.—Houston [1st Dist.] May 21, 2013, pet. ref'd) (mem. op., not designated for publication) (showing complainants two still photos of defendant and later a photo spread with defendant's photo did not constitute an impermissibly suggestive pretrial identification procedure).

Even assuming for argument's sake that the pretrial identification procedure used by the police was unduly suggestive, we cannot conclude that it would have given rise to a substantial likelihood of misidentification and thus would have been inadmissible.

In determining whether an impermissibly suggestive identification procedure gave rise to a substantial likelihood of misidentification, a court weighs the

19

following factors: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Neil*, 409 U.S. at 199; *Santos*, 116 S.W.3d at 453, 455-56. Because this list of factors is not exhaustive, a court also may consider these additional factors: (1) any identification prior to the lineup of another person; (2) the identification by photograph of the defendant prior to the line-up; and (3) any failure to identify the defendant on a prior occasion. *Santos*, 116 S.W.3d at 453, 455-56.

The complainant gave a general description of his assailant, describing him as a "large black male," and the complainant did not have a prolonged amount of time to view his assailant at the time of the robbery. Nonetheless, the complainant tentatively identified appellant as his assailant on a photo spread four days after the robbery. Shortly thereafter, the complainant positively identified appellant in a live line-up at the police station. The complainant testified that he was sure that he identified his assailant in the live line-up. He testified that he got a "good look" at both men who robbed him, and told Sergeant Minchew at the police station that he remembered appellant's face.

Minchew confirmed that the complainant tentatively had identified appellant on a photo spread, and positively identified Valdillez on a photo spread. Minchew testified that the complainant positively identified appellant in a live line-up. According to Minchew, the complainant said "number one" to his daughter at the start of the line-up and stared at appellant in position #1 "for quite a while until everybody started doing their turns. And then as soon as it was over and the fifth inmate stepped back, he starts saying: Number one again. Number one, number

one, number one." Minchew also testified that the complainant was "ringing his hands and he was clenching his fists repeatedly and he would close his eyes and open them back up, but he just continued to look at number one off and on."

The complainant never failed to identify appellant before trial, even though the photo spread identification was tentative. The time period between the pretrial identifications and the robbery was short. Both the complainant and Minchew confirmed that the complainant was certain of his identification of appellant as his assailant at the line-up.

We conclude that appellant cannot show that the pretrial identification procedure used by the police gave rise to a very substantial likelihood of misidentification so as to deny appellant due process, even if it was unduly suggestive. Appellant therefore cannot show that the pretrial identification was inadmissible, and that a trial court would have erred in not granting a motion to suppress or sustaining an objection challenging the pretrial identification's admissibility had trial counsel taken these steps.[3]

---

[3] Appellant also states in his second issue that article 38.20 of the Texas Code of Criminal Procedure requires law enforcement agencies to (1) adopt policies ensuring that the officer who administers an identification procedure does not know who the suspect is in an investigation; and (2) "adopt instructions for officers to give to witnesses before lineups." *See* Tex. Code Crim. Proc. Ann. art. 38.20, §3(c)(2)(B), (E) (Vernon Supp. 2013). Appellant states that the complainant did not receive any instructions before viewing the photo spread and the "instructions before the live line-up generally involved reassurances that he would be safe. Both the procedure and his testimony about it were highly unreliable." We reject appellant's attempt to challenge the pretrial identification procedure in this case on the basis that the police did not adopt or follow identification procedure policies outlined in article 38.20. The statute applies "only to a photograph or live lineup identification procedure conducted on or after September 1, 2012." Tex. Code Crim. Proc. Ann. art. 38.20 historical note [Act of May 18, 2011, 82nd Leg., R.S., ch. 219, §2(c), 2011 Tex. Gen. Laws 793, 795]; *see also Washington v. State*, No. 01–11–00615–CR, 2013 WL 2299179, at *6 n.6 (Tex. App.—Houston [1st Dist.] May 21, 2013, pet. ref'd) (mem. op., not designated for publication). Here, the identification procedure was conducted in September 2011.

Accordingly, appellant cannot satisfy the *Strickland* test and prevail on an ineffective assistance claim premised on counsel's failure to file a motion to suppress or to object during trial to "testimony about the live line-up or the video of the live line-up" on the ground that the pretrial identification procedure used by the police was impermissibly suggestive.

We overrule appellant's second issue.

## III.    Jury Instruction

Appellant contends in his third issue that he was egregiously harmed by the trial court's failure to instruct the jury *sua sponte* on the "unreliability of eyewitness identification."   Appellant argues that his pretrial identification was "tainted and unreliable," and that therefore the trial court's failure to instruct the jury "about the scrutiny it needed to give that evidence" deprived him of a due process protection recognized in *Perry v. New Hampshire*, 132 S. Ct. 716, 730 (2012).

Contrary to appellant's assertion that the pretrial identification procedure was tainted, we already have determined that the police's pretrial identification procedure in this case was not impermissibly suggestive.   Additionally, the Supreme Court in *Perry* did not hold that a trial court is required to instruct a jury *sua sponte* that eyewitness identifications are unreliable.

In *Perry*, the Court was asked to decide the question whether the Due Process Clause requires a trial court to conduct a preliminary assessment of the reliability of an eyewitness identification made under impermissibly suggestive circumstances not arranged by the police; in other words, there was no state action. *See id*. at 723.  The Court held that, when no improper law enforcement activity is involved, reliability is sufficiently tested "through the rights and opportunities

generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id*. at 721. The Court highlighted its prior holdings that due process concerns arise only after a defendant establishes improper police conduct, *i.e.*, that police used an identification procedure that is "both suggestive and unnecessary." *Id*. at 724, 726

The Court underscored the jury's role in making credibility determinations, stating, "[o]ur unwillingness to enlarge the domain of due process . . . rests, in large part on our recognition that the jury, not the judge, traditionally determines the reliability of evidence." *Id*. at 728. The Court further stated, "[w]e take account of other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability," including (1) "the defendant's Sixth Amendment right to confront the eyewitness;" (2) "the defendant's right to the effective assistance of an attorney, who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments;" (3) "[e]yewitness-specific jury instructions, which many federal and state courts have adopted, [that] warn the jury to take care in appraising identification evidence;" (4) "the constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt;" (5) state and federal rules of evidence that permit trial courts to "exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury;" and (6) "expert testimony on the hazards of eyewitness identification evidence." *Id*. at 728-29.

Accordingly, *Perry* does not require a trial court to instruct a jury on the

reliability of eyewitness identifications, and appellant misplaces his reliance on *Perry* for his argument that he was egregiously harmed by the trial court's failure to *sua sponte* "instruct the jury on the reliability of eyewitness identification."

Additionally, several of the safeguards noted in *Perry* were present and utilized in this case. Appellant's trial counsel confronted the complainant and vigorously cross-examined the complainant and the police officers involved in the investigation of the offense. Further, trial counsel began his closing argument by stating, "[t]his case is all about eyewitness identification" and continued to focus his closing argument almost entirely on the asserted fallibility and unreliability of the complainant's identification; he pointed out asserted flaws in the way the police conducted the pretrial identification procedures along with asserted weaknesses in the complainant's testimony. Finally, the jury charge instructed the jurors that appellant's guilt be established beyond a reasonable doubt, and that the jurors are "the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony."

Appellant also points to the discussion of eyewitness identification in *Tillman v. State*, 354 S.W.3d 425, 436 (Tex. Crim. App. 2011). However, *Tillman* did not require a trial court to instruct the jury *sua sponte* on the "unreliability of eyewitness identification," nor did it address a jury instruction issue. Instead, the court addressed the admissibility of expert testimony regarding eyewitness identifications.

In *Tillman*, the defendant proffered the testimony of Dr. Roy Malpass as an expert on eyewitness identifications. *Id*. at 429–32. After a hearing outside the presence of the jury, the trial court excluded the testimony. *Id*. at 433. The court of criminal appeals granted review to address whether proffered expert testimony regarding eyewitness identification was properly excluded by the trial court. *Id*. at

24

434. It concluded that the expert testimony was reliable and relevant, and held that "the trial court abused its discretion when it excluded reliable, relevant evidence that would 'assist the trier of fact' by increasing the jurors' awareness of biasing factors in eyewitness identification." *Id*. at 442. Thus, *Tillman* concerned the admissibility of expert testimony relating to eyewitness identification; it did not consider whether a jury instruction on eyewitness identification is required or even appropriate.

We overrule appellant's third issue.

## IV. Court Costs

Appellant argues in his fourth issue that the trial court's assessment of court costs was unlawful because the record does not contain a bill of costs. Appellant asks this court to modify the trial court's judgment to delete the assessed court cost in the amount of $304 and "specifically order the Texas Department of Criminal Justice to reimburse him all money that has been withdrawn from his inmate trust account under TEX. GOV'T CODE ANN. § 501.014 (e)(4), and to refrain from withdrawing any other funds from his account for the purpose of satisfying court costs."

The judgment was signed on August 1, 2012, and includes an assessment of $304 in court costs. The supplemental clerk's record contains a certified, signed bill of costs listing $304 in court costs. We review the assessment of court costs on appeal to determine if there is a basis for the costs, not to determine whether there was sufficient evidence offered at trial to prove each cost. *Johnson v. State*, No. PD-0193-13, 2014 WL 714736, at *2 (Tex. Crim. App. Feb. 26, 2014). Traditional sufficiency-of-the-evidence standards of review do not apply. *Id*.

Generally, a bill of costs must (1) contain the items of cost, (2) be signed by

the officer who charged the cost or the officer who is entitled to receive payment for the cost, and (3) be certified. *Id.* at *5; *see* Tex. Crim. Proc. Code Ann. arts. 103.001, 103.006 (Vernon 2006). The record supports the assessment of costs in this case because the record contains a bill of costs that contains each item of cost, is signed by a representative of the district clerk's office who is entitled to receive payment of the costs, and is certified. *See Johnson*, 2014 WL 714736 at *4. There being no challenge to any specific cost or the basis for the assessment of such cost, the bill of costs supports the costs assessed in the judgment. *Id.* at *8.

We overrule appellant's fourth issue.

### Conclusion

We affirm the trial court's judgment.


/s/     William J. Boyce
Justice

Do Not Publish — TEX. R. APP. P. 47.2(b).
Panel consists of Justices Boyce, Christopher, and Brown.